# CHARLESTOWN.

STATE OF WEST VIRGINIA *v.* CAIN.

Submitted June 20, 1882—Decided August 19, 1882.

1. It is not error for the court in the presence of the jury to hear evidence to lay the foundation for admitting the dying declaration of the deceased, especially where the court admonishes the jury, that the evidence is not for them but for the court alone.  (p. 684.)

2. It is not the duty of the prosecuting attorney on a criminal trial to examine all the witnesses, who were present at the commission of an alleged offense, nor all the witnesses, who were sent to the grand jury, when the indictment was found, and where names are at the foot or on the back of the indictment, and who may have been examined at the coroner's inquest, and who have been recognized to appear at the trial by the State. It is the province of the prosecuting officer, and not of the court, to determine, who shall be examined as witnesses on behalf of the State.  (p. 685.)

3. Before the declaration of a co-conspirator made in the absence of the prisoner can be given in evidence against the accused; there must be proof sufficient in the opinion of the court to establish *prima facie* the fact of conspiracy between the parties; the question of the existence of such conspiracy being ultimately for the jury. (p. 694.)

4. Although such evidence of the declaration of an alleged co-conspirator be admitted without such foundation being laid, yet the judgment will not be reversed for this reason, if the facts proved, or evidence certified show that *prima facie* the fact of conspiracy had been established. (p. 694.)

5. In considering the admissibility of the declarations of an alleged co-conspirator made in the absence of the prisoner such declarations so made will not be regarded as evidence of the fact of conspiracy, unless they so accompany the execution of the common criminal intent, as to become a part of the *res gestæ*, or in themselves tend to further the execution of the common criminal intent. (p. 694.)

6. Where there is a quarrel between two persons, and both are in fault, and a combat as the result of such quarrel takes place, and death ensues, in order to reduce the offense to killing in self defense, two things must appear from the evidence and the circumstances of the case, first that before the mortal blow was given, the prisoner declined further combat and retreated, as far as he could with safety; and secondly, that he necessarily killed the deceased in order to preserve his own life, or to protect himself from great bodily harm. (p. 700.)

7. When one without fault himself is attacked by another in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life, or to do him some great bodily harm, and there is reasonable grounds for believing the danger imminent, that such design will be accomplished, and the person assaulted has reasonable ground to believe, and does believe, such danger is imminent, he may act upon such appearances and without retreating, kill his assailant, if he has reasonable grounds to believe, and does believe, that such killing is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out, that the appearances were false, and that there was in fact neither design to do him some serious injury nor danger, that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case. (p. 703.)

8. In such a case as to the imminency of the danger, which threatened the prisoner, and the necessity of the killing in the first instance the prisoner is the judge; but he acts at his peril, as the jury must pass upon his action in the premises, viewing

said actions from the prisoner's stand-point at the time of the killing; and if the jury believe from all the facts and circumstances in the case, that the prisoner had reasonable grounds to believe, and did believe, the danger imminent, and that the killing was necessary to preserve his own life or to protect him from great bodily harm, he is excusable for using a deadly weapon in his defense, otherwise he is not. (p. 703.)

9. Although in one part of the instruction the law is propounded correctly, yet if in another part of the instruction the law on the same subject is incorrectly stated, the instruction is calculated to mislead the jury, as they are left to conjecture, which part of the instruction states the law of the case, and for such an erroneous instruction the judgment will be reversed. (p. ——.)

10. Where a homicide is proved, the presumption is, that it is murder in the second degree. If the State would elevate it to murder in the first degree, she must establish the characteristics of that crime; and if the prisoner would reduce it to man-slaughter, the burden of proof rests upon him. (p. 709.)

11. A man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act; and if the prisoner with a deadly weapon in his possession without any or upon very slight provocation gives to another a mortal wound, the prisoner is *prima facie* guilty of willful deliberate and premeditated killing, and the necessity rests upon him of showing extenuating circumstances, and unless he proves such extenuating circumstances, or the circumstances appear from the case made by the State, he is guilty of murder in the first degree. (p. 709.)

12. The bare fear, that a man intends to commit murder or other attrocious felony, however well grounded, unaccompanied by any overt act, indicative of such intention, will not warrant killing the party by way of prevention. To warrant said killing, there must be some overt act indicative of imminent danger at the time; and the acts of the assailant must be such, as under all the evidence and circumstances of the case convince the jury, that the prisoner had reasonable grounds to believe, and did believe, the danger imminent, and that the killing was necessary to preserve his own life or to protect him from great bodily harm. (p. 710.)

13. An instruction, which is confused in its language and makes it doubtful what is intended thereby, and is calculated to mislead the jury, should not be given. (p. ——).

14. The word, "papers," as read in section 12 of chap. 131 of the Code, does not include depositions; therefore the court did not err in refusing to permit the jury to take to their room a deposition,

taken before the coroner at the inquest, which was read without objection. (p 707.)

Writ of error to a judgment of the circuit court of the county of Jackson rendered on the 24th day of March, 1882, in a trial on an indictment for murder in said court then pending, wherein the State was plaintiff and John W. Cain was defendant, allowed upon the petition of said Cain.

Hon. Robert F. Fleming, judge of the sixth judicial circuit, pronounced the judgment complained of.

The facts of the case are fully stated in the opinion of the Court.

*Virgil S. Armstrong*, for plaintiff in error, cited the following authorities: 2 Gratt. 611; Whar. Crim. Ev. (8th ed.) § 448; Whar. Crim. Prac. (8th ed.) § 565; Whar. Crim. Law (5th ed.) § 702; 1 East P. C. 96; Whar. on Hom. (8th ed.) §.493; *Id.* § 520; Code ch. 131 § 12; Whar. Crim. Pl. and Prac. (8th ed.) § 828; Code ch. 144 § 5.

*C. L. Brown & R. S. Brown* for plaintiff in error cited 33 Gratt. 834; 8 Leigh 726; 6 Gratt. 723; 1 Gra. & Wat. New Trials 505; Whar. Pl. & Pr. § 790 *et seq.*; 1 Greenl. Ev. (13th ed.) § 111; 1 Chitt. Crim. Law s. p. 566; Ros. Crim. Ev. 128; 1 Greenl. Ev. § 448 note 3; 1 Whar. Crim. Law (8th ed.) §§ 488, 492; 8 W. Va. 741; 3 Gra. & Wat. New Trials 773, 744, *et seq.*; Whar. Crim. Ev. (8th ed.) §§ 721, 722; Horr & Thom. Self Defense, 909, 910; 5 Ia. 433; 42 N. Y. 1; Walk. Am. Law 445; Horr & Thom. Self Defense, 1, 2, 3; 1 West. L. Jour. 23; 1 Whar. Crim. Law (8th ed.) § 486, A; 3 Greenl. Ev. §§ 122 and note 8, 124.

*J. L. Menager* for plaintiff in error cited the following authorities: 3 Leigh 186; 6 Gratt. 611; 14 Gratt. 613; 26 Gratt. 96; 2 Whar. Crim. Ev. (8th ed.) 299; 1 Greenl. Ev. 160; Whar. Crim. Ev. 448; Whar. Crim. Pr. & Pl. 565; 8 C. & P. 559; 9 C. & P. 22; 50 Vt. 338; 75 N. C. 109; 25 Mich. 405; 40 Mich. 716; 2 Cox C. C. 191; 3 Cox C. C. 82; 18 Wall. 516; 7 Blackf. 427; 26 Me. 312; 45 Vt. 308; 1 Gray 61; 5 Cash. 316; 9 Gray 136; 7 Gratt. 641; 21 Gratt.

895 ; 31 Gratt. 484 ; *Id.* 849 ; 1 Hawks 442 ; Whar. Crim.
Ev. 698; 1 Greenl. 111 ; 2 Whar. Crim. Law 1406 ; 14 Ohio
St. 238 ; 1 East S. C. 96 ; 8 W. Va. 773 ; 1 Bish. Crim. Law
§§ 865, 866, 867 ; 59 Ind. 80 ; 14 Gratt. 596; *Id.* 613; 12
Pick. 496 ; 5 How. (Miss.) 187 ; *Com.* v. *McCall,* 1 Va. Cas.;
10 Yerg. 241.

*Charles E. Hogg* for plaintiff in error cited the following
authorities :    Harr. Hinst. &c., § 3 ; 7 Barb. 585 ; 8 C. & P.
22 ; 8 C. & P. 568 ; Whar. Crim. Ev. 698 ; 4 Gratt. 547 ; 9
Am. Dec. 657 ; 1 Greenl. Ev. § 3 ; 57 Ind. 40 ; 2 N. Y. 193; 46
N. Y. 625 ; 25 Gratt. 887 ; Whar. Crim. Law (8th ed.) § 489 ;
12 Pick. 406 ; Warden (Ohio) 54; Gra. & Wat. New Trials,
309, 325.

*Attorney-General Watts* for the State cited the following
authorities:    2 Gratt. 611 ; 2 Va. Cas. 120; 1 East C. L.
353 ; *Id.* 354 ; 5 W. Va. 513 ; Whar. Crim. Ev. (8th ed.)
448 ; 56 Ind. 26 ; 37 Mich. 5 ; Whar. Crim. Pr. & Pl. § 565,
*et seq.*; 6 C. & P. 186 ; Rosc. Crim. Ev. (8th ed.) 136 ; 1 C. &
P. 84; 12 Gratt. 717 ; 1 Whar. Crim. Law § 486, A ; 1 Hale
481; 44 Tex. 356 ; 29 Ohio St. 186 ; 21 Gratt. 909; 76 Pa.
St. 340 ; Whar. Crim. Pl. & Pr. §§ 828, 829 ; 61 Ill. 365 ;
1 Bish. Crim. Pro. § 980 ; 2 Gratt. 595 ; 25 Gratt. 893, 900,
902; 5 Leigh 598; 8 Leigh 726; 6 Gratt. 712 ; 7 Gratt. 613 ;
17 Gratt. 561; 18 Gratt. 977 ; 7 Leigh 608 ; 8 Leigh 745 ;
8 Gratt. 267 ; *Id.* 641 ; 19 Gratt. 485.

JOHNSON, PRESIDENT, announced the opinion of the Court:

On the 2d day of November, 1881, John W. Cain was in
the circuit court of Jackson county indicted for the murder
of Henry Brown on the 26th day of October, 1881.    On the
3d day of March, 1882, the prisoner having pleaded not
guilty to the indictment was put upon his trial before a jury.
From the certificate of the evidence made a part of the record
it appears, that soon after dark on the 26th day of October,
1881, as the defendant and deceased and several other parties
were going along the public road, the prisoner shot the
deceased with a pistol, from which wound he died about
thirty-six hours thereafter.    By the State it was insisted,

that it was a deliberate, willful and premeditated killing; and by the prisoner it was contended, that the killing was done in self-defense.   On the 16th day of March, 1882, the jury rendered a verdict, finding the prisoner not guilty of murder in the first degree but guilty of murder in the second degree, and fixed his term of imprisonment in the penitentiary of the State at fourteen years.   The prisoner moved to set aside the verdict and for a new trial.   On the 22d day of March, 1882, the prisoner's said motion was overruled, and judgment was entered upon the verdict of the jury.   During the trial the prisoner saved ten several exceptions to rulings of the court, which were signed, sealed and made a part of the record of the case.   To the said judgment the prisoner obtained a *writ of error*.

The first *two* bills of exceptions were to the hearing *before the court in the presence of the jury* evidence of the condition of the deceased immediately after he was shot, and of what he said, to lay the foundation for introducing the dying declaration of the deceased.   The court after hearing the evidence refused to permit the declarations of the deceased to go to the jury, not deeming a proper foundation laid, and telling the jury, that the evidence heard was for the court alone and not for the jury.   The question here presented is, whether it is error for a *court*, to hear in the presence of the jury evidence to enable it to ascertain, whether dying declarations are admissible, or whether in such a case it is required, that the jury should be sent out of the court-room, while such evidence is being heard by the court.   All the authorities agree, that whether such declarations are admissible, is a question for the court alone.   No authority is cited by counsel for the defense, showing that for the court to hear such evidence in the presence of the jury is error.   We know it is the usual practice in cases like this as in all others to argue the admissibility of evidence in the presence of the jury, and not in such cases to send the jury from the court-room.   If it were required in all cases, when the admissibility of testimony is being considered by the court, to have the jury retire, the practice would result in very great inconvenience.   In *Hill's Case*, 2 Gratt. 595, it was held, that where the court permitted the dying declaration of the de-

ceased to go in evidence to the jury, reserving the question whether they were made under an expectation of death, and it appeared from the testimony, that they were made in expectation of death, and were therefore competent testimony, this was no error, of which the prisoner could complain. It would have been different if the declarations had been improperly admitted. It is not error for the court, in ascertaining whether such declarations of the deceased are proper to go to the jury as his dying declaration, to hear evidence in the presence of the jury, especially where the court admonishes the jury, that said evidence is not for them but for the court alone.

The *third* bill of exceptions is to the refusal of the court to require the attorney for the State to put A. A. Noyes on the witness-stand, and examine him as a witness for the State; he having been named at the foot of the indictment as one of the twelve witnesses, on whose evidence the indictment was found; and having been recognized by the State to appear as a witness for the State in the case, and having been present at the killing, and examined at the coroner's inquest held over the body of the deceased. The bill of exceptions further shows, that "whereupon the prisoner moved the court to direct the counsel for the State to call said A. A. Noyes as a witness for the prosecution, and examine him touching the homicide of Henry Brown, which occurred on the night of October 26, 1881, as charged in the indictment, and in default of the State so calling said Noyes as a witness, that then the court should instruct the jury to find the defendant not guilty; which motion the court overruled and declined to direct the State to call the said A. A. Noyes as a witness for the prosecution, and also declined to instruct the jury to find the defendant not guilty. And thereupon the court upon its own motion directed the said A. A. Noyes to be called as a witness in the above cause, and said Noyes was called as a witness in said cause by the court as aforesaid, and leave given to both State and defendant in this cause to examine and cross-examine said witness Noyes, and said witness was by leave of the court examined and cross-examined by both the defendant and the State. To which ruling and opinion of the Court in overruling the defendant's motion as

aforesaid, and in permitting the counsel for the State to cross-examine the witness Noyes, and in refusing to direct the cousel for the State to call said Noyes as a witness, for the State, and in refusing to instruct the jury, to find the defendant not guilty, without the testimony of said Noyes, the defendant excepted &c."

The counsel for the prisoner rely, to sustain the position they have taken, on the following among other authorities: Roscoe Crim. Ev. 128; 1 Greenl. Ev. § 82; Whaton's Crim. Ev. § 448 and note; Wharton's Crim. Ev. Pl. and Pr. § 565; *Reg.* v. *Holden*, 8 C. & P. 606; *Reg.* v. *Chapman*, 8 C. & P. 559; *Reg.* v. *Bull*, 9 C. & P. 22; *State* v. *Magoon*, 50 Vt. 338; *State* v. *Smallwood*, 75 N. C. 104; *State* v. *Hurd*, 25 *Mich.* 405.

Mr. Wharton in his Criminal Evidence, section 448, says: "Although" says Mr. Roscoe "a prosecutor was never in strictness bound to call every witness, whose name is on the back of the indictment, yet it is usual to do so, in order to afford the prisoner's counsel an opportunity to cross-examine them; and if the prosecutor would not call them, the judge in his discretion might. The judges however have now laid down a rule, that the prosecutor is not bound to call witnesses, merely because their names are on the back of the indictment, but that the prosecutor ought to have all such witnesses in court, so that they may be called for the defense, if they are wanted for that purpose. If however they are called for the defense, the person calling them makes them his own witnesses."

The prosecution is usually bound to call all the attainable witnesses to a transaction, which is the subject of examination. Thus on a trial for murder, where the widow and daughter of the deceased were present, when the fatal blow was supposed to have been given, and the widow was examined on the part of the prosecution, Patteson J. directed the daughter to be called also, although her name was not on the indictment, and she had been brought to the assizes by the other side. "Every witness," he said, "who was present at a transaction of this sort, ought to be called, and even if they give different accounts, it is fit, that the jury should hear their evidence, so as to draw their own conclusions as to the real truth of the matter."

In his criminal Pl. & Pr. at section 568, Wharton says: "The prosecution is not at liberty to put in part of the evidence making out its case, and then rest. It is bound under ordinary circumstances, and where this can be done without undue accumulation of testimony to call the witnesses present at the commission of the act, which is the subject of the indictment. It is unnecessary to add, that all the witnesses named on the back of the indictment must be summoned by the prosecution. The prosecutor should have all such witnesses in court, so that they can be called for the defense; but if so called, they become the defendant's witnesses." He cites cases above cited by defendant's counsel.

In *Regina* v. *Chapman*, 8 C. & P. 558, where it was stated by the grand jury on their returning a true bill for murder, that an important witness was too ill to give evidence in court, the judge directed two surgeons to see the witness, and on their stating on the *voire dire*, that the witness was too ill to give evidence in court, the judge ordered the trial to be postponed to the next assizes, and the prisoner to be detained in custody.

In *Regina* v. *Holden*, 8 C. & P. 606, *Watson* for the prosecution after calling several witnesses proposed to call one of the medical witnesses.

*Patteson, J.*—"Why is not the daughter called now? She is here."

*Watson*—"Her name is not on the back of the indictment; and she is brought here by the other side. I did not intend to call her."

*Patteson, J.*—"She ought to be called. She was present at the transaction. Every witness, who was present at a transaction of this sort, ought to be called; and even if they give different accounts, it is fit, that the jury should hear their evidence, so as to draw their own conclusions as to the real truth of the matter."

" The daughter of the deceased was examined."

" It appeared from the evidence of Mr. Bryant, the surgeon who attended the deceased from the 26th of April to the time of his death, that there had been a post mortem examination of the body of the deceased, in the presence of himself and two other surgeons named Mager

and Henderson, and it appeared that there was some difference of opinion as to the cause of the death of the deceased. In his cross-examination it was stated by Mr. Bryant that Mr. Henderson was in court."

" Mr. Mager was called on the part of the prosecution but not Mr. Henderson."

*Patteson, J.*—" You should call Mr. Henderson."

*Mr. Bellany* (the clerk of assize) stated, that the name of Mr. Henderson was not on the back of the indictment."

*Patteson, J.*—" I am aware of that; but as he is in court, I shall insist on his being examined. He is a material witness, who is not called on the part of the prosecution; and as he is in court, I shall call him for the furtherance of justice."

" Mr. Henderson was called and examined by the learned judge."

In *Regina* v. *Bull*, 9 C. & P. 22, the following appears:

" *Payne* for the prosecution in stating the case to the jury said, that there was one witness examined before the grand jury, whom on account of information he had received, it was not his intention to use as a witness for the prosecution."

" *C. Phillips* for the prisoner objected to any witnesses being kept back, as it would be unfair towards the prisoner not to examine all these, whose names were on the back of the bill."

"*Payne* replied, that of course he should put the witnesses into the box, but it was not his intention to rely upon him as a witness for the prosecution."

" *C. Phillips* said, that on the last Oxford circuit in a case before Mr. Justice Patteson *Watson*, who was counsel for the prosecution, observed that there were four surgeons, who had given evidence before the grand jury, but he should only call three of them, upon which the learned judge said 'then I shall call the fourth,' and upon the evidence of that fourth surgeon the prisoner was acquitted."

"*Payne* in reply stated, that in a case of manslaughter tried a few sessions ago, at the central criminal court before the same learned judge, the counsel for the prosecution were allowed to abstain from putting questions to two of the witnesses, whose names were on the back of the bill, and he further stated, that in the present case he should call the witness and put him in the box, but did not intend to examine him."

" *Vaughan* J. said : 'It is the proper course to put the witness into the box. I think, that every witness ought to be examined. In cases of this kind counsel ought not to keep back a witness, because his evidence may weaken the case of the prosecution. Our only object here is to discover the truth.' The witness alluded to was put into the box, after all the other witnesses had been examined, and a few questions were put to him on the part of the prosecution, but he was not examined as to the facts generally as the other witnesses were. He was cross-examined at some length on the part of the prisoner."

In *Rex.* v. *Simmonds*, 1 C. & P. 84, the prisoner was indicted for stealing a mare. When the prosecution had closed his case, Hallock, B., observed, that there was the name of another witness (who had not been called) on the back of the indictment. The counsel for the prosecution declined calling him. Hallock, B.; "Though the counsel for the prosecution is not *bound* to call every witness whose name is on the back of the indictment, it is *usual* for him to do so, and if he does not I as the judge will call the witness that the prisoner's counsel may have an opportunity of cross-examining him." In a note on the same page it appears, that in *Rex.* v. *Whitbread* C. B. June 1823, for larceny, *Ally* for the prosecution omitted to call an apprentice of the prosecutor, who had been implicated in the theft, and was examined at the police-office and before the grand jury, and whose name was on the back of the indictment. *Ally* refused to call him, saying, that the prisoner's counsel might himself call him, if he chose. Holroyd, J., and Burrough, J., held, that the prosecutor's counsel was not *bound* to call the witness whose name was on the back of the indictment, merely to let the other side cross-examine him. The witness was not called at all. However at the Worcester Sum. Ass. 1823 Park, J., in the case of *Rex.* v. *Jayler* for larceny called all the witnesses on the back of the indictment, whom the prosecutor had not called, merely to allow the prisoner's counsel to cross-examine them. In the note are the further remarks: "It seems more conducive to the discovery of truth to call every one, who has ever been a witness in the case, than to allow the prosecutor to select his witnesses and keep back

any one, whom he considers unfavorable to his prosecu-
tion.  As to the prisoner's counsel calling them, in gen-
eral he would be very unwise to risk as his witnesses any man,
who has ever been thought of as a witness in support of the
prosecution."

In *Rex.* v. *Bodle,* 6 C. & P. 186, the prisoner was indicted
for the murder of his grandfather.  The name of the father
of the prisoner was on the back of the indictment, and he
was sworn with the other witnesses for the prosecution to go
before the grand jury; but the grand jury found the bill
without calling him in and examining him.  At the close of
the case for the prosecution the counsel for the prosecution
declined to call the father of the prisoner as a witness.  The
counsel for the prisoner stated, that the prisoner's father was
the first person to prefer the charge against the prisoner, that
he had been examined at great length before the coroner,
who had bound him over to give evidence at the assizes, and
his name was on the indictment, and he had been sworn to
go before the grand jury, although he had not been called in;
and they further stated that it was of the greatest importance
to the prisoner, that he should be called.  Gaselee, J., having
conferred with Mr. Baron Vaughan said:  "My learned
brother and myself are of opinion, that if a counsel for a
prosecution decline calling a witness, whose name is on the
back of the indictment, it is in the discretion of the judge,
who tries the case, whether the witness shall be called for the
prisoner's counsel to examine him, before the prisoner is
called on for his defense, and we think in this most serious
case, the father of the prisoner ought to be put into the box
for the prisoner's counsel to ask him as to anything that may
be material to the prisoner's defense."  The witness was
called and the prisoner's counsel asked him a number of ques-
tions as to statements, which he had made at different times
respecting the murder with a view of discrediting and contra-
dicting and thereby raising a suspicion, that the witness might
have committed the murder himself.  The prisoner's counsel
then prepared to call witnesses to contradict the prisoner's
father, as to the different accounts which he had given of the
murder; but the judge denied his right to do so, saying, he
"had allowed the examination of this witness to assume the

shape of a cross-examination, because in almost all the cases, where the question had been as to putting a witness into the box, where none had been on the back of the indictment, and who had not been called by the prosecution, the judges had said it was that the prisoner's counsel might have the opportunity of cross-examining him; but as he had not been examined by the counsel for the prosecution, and had been only called at the instance of the counsel for the prisoner, the latter could not be allowed to call witnesses to contradict him."

In *State* v. *Magoon*, 50 Vt. 338, Ross, J., said: "It is true, that the courts of this State in the trials of criminal causes have generally, but not necessarily, required the prosecution to put in its whole case in the opening, and have confined it in the close to testimony, which tended to refute the testimony of the respondent. We apprehend, that this practice, so far as it varies in this respect from that, which obtains in civil cases, has been adopted rather out of tenderness to the respondent, and that before entering on his defense he might be fully apprised of the case, which he had to meet, than because he could of right demand it. But neither in this State nor country, so far as we are aware, has it ever been pushed to the extreme, of rejecting in the close testimony, which legitimately tended to weaken the effect of the testimony adduced by the respondent, because it also tended to confirm and strengthen the testimony introduced in the opening of the prosecution."

In *Hurd* v. *The People*, 25 Mich. 405, it was held: "The prosecution can never in a criminal case properly claim a conviction upon evidence, which expressly or by implication shows but a part of the *res gestæ* or whole transaction, if it appears that the evidence of the rest of the transaction is attainable; and as a general rule all the witnesses present at the transaction, that are attainable, unless it appears, that the testimony of those not called would be merely cumulative, should be called for the prosecutor, before the prisoner is put to his defense."

In *State* v. *Martin*, 2 Ind. 119, Ruffin, C. J., said: "The position that the State is bound to examine all the persons, who were present at the perpetration of the fact, or to exam-

ine on the trial all witnesses, who had been sent to the grand jury, has neither principle nor practice in this State to support it. The persons present are not the witnesses of the law like persons, who have attested a will. It is in the discretion of the prosecuting officer as of any public suitor, what witnesses he will call. He examines such, as he deems requisite to the execution of the public justice. If others can shed more light on the controversy, or place it in a new point of view, it is competent for the prisoner to call them. Without considering therefore the peculiar reasons, on which the particular persons were dispensed with on this trial, and notwithstanding a modern case in England, we think the ruling of his Honor right, on the broad ground that it was the province of the solicitor, and not of the court, to determine, who should be the State's witnesses."

In *State v. Smallwood,* 75 N. C. 106, Rodman, J., said: "The judge told the jury, that they could not consider *at all* the circumstance, that Bond was not intended as a witness on behalf of the State. It is settled, that the court could not require the solicitor to introduce Bond as a witness for the State. He is the sole judge of what witnesses he shall introduce. *State v. Martin,* 2 Ind. 101. But it does not follow, that the jury cannot consider such omission and draw from it any reasonable and natural inference. We will not say, that ordinarily any inference adverse to the State may be drawn from the omission of the solicitor to introduce all the witnesses present at the commission of an alleged offense. It may be, that in his opinion the case is strong enough without them. Our remarks are confined to the circumstances of the present case."

Mr. Wharton in his work on Criminal Ev. § 557 says: "In England until recently the right of defendants in criminal cases to be represented by counsel on trial was denied or abridged. At present in that country these restrictions are removed. They never existed in the United States. And the right to appear by counsel is guaranteed by the Constitution of the United States and by the Constitutions of most of the States." This is no doubt the reason of the practice in England as appears by the cases cited.

In our State, by the bill of rights sec. 14 it is declared:

"Trials of crimes and of misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public, without unreasonable delay and within the county, where the alleged offense was committed, unless upon petition of the accused, and for good cause shown it is removed to some other county. In all such trials the accused shall be fully and plainly informed of the character and cause of the accusation, and confronted with the witnesses against him, and shall have the assistance of counsel and a reasonable time to prepare for his defense; and there shall be awarded to him compulsory process for obtaining witnesses in his favor."

Under this benign provision of our Constitution there is no necessity, for requiring the State to call all the witnesses, who were present, when an offense was committed. The defendant is fully protected; he has the assistance of counsel, and the State is compelled to grant him compulsory process for obtaining witnesses in his favor. The State is bound to make out its case against the prisoner beyond a reasonable doubt, and if she does not call all her witnesses, and the case is not made out, she suffers. If she only calls such as are favorable to the prosecution, the defendant has the right to call those, who, he supposes, will swear to facts in his favor. The rule laid down by Ruffin, C. J., in *State v. Martin supra* is that it is not the duty of the State or of those, who prosecute for it, to examine on a criminal trial all the witnesses, who were present at the commission of an alleged offense, or all the witnesses, who were sent to the grand jury, when the indictment was found, and whose names are on the back of the indictment, or who may have been examined at the coroner's inquest. It is the province of the prosecuting officer, and not of the court, to determine, who shall be examined as witnesses on behalf of the State." This rule is the one, that has obtained in Virginia and this State without question heretofore; and we see no injustice in it. Even under the English rule the court did not err in the case at bar; for it called the witness in accordance with the English practice. The court did not err, in refusing to direct the attorney for the State to call the witness Noyes, and of course did not err in refusing to instruct the jury as requested, upon such refusal of the attorney for the State to call the witness.

The *fourth* bill of exceptions is to the admission of declarations of the alleged co-conspirator, Gibbs, in the absence of the prisoner, before sufficient evidence of the conspiracy was before the court. The rule laid down in the books is, that before the declarations of a co-conspirator, made in the absence of the prisoner, can be given in evidence against the accused, there must be proof sufficient in the opinion of the court to establish *prima facie* the facts of conspiracy between the parties, the question of such conspiracy being ultimately for the jury. Wharton Cr. E. sec. 698 ; 1 Greenl. Ev. sec. 111 ; 1 Chitty. Cr. L. 566 ; *Com.* v. *Crowninshield,* 10 Pick. 497 ; *Com.* v. *Ingraham,* 7 Gray 46 ; *Clawson* v. *State,* 14 Ohio St. 234 ; *State* v. *Daubert,* 42 Mo. 239 ; *Browning* v. *State,* 30 Miss. 656 ; *Jones* v. *Com.,* 2 Dev. 48 ; *Hightower* v. *State,* 22 Tex. 605 ; *Williamson* v. *State,* 4 Gratt. 547 ; *Sand's case,* 21 Gratt. 895 ; *Danville Bank* v. *Waddill's adm'r.,* 31 Gratt. 484.

The only evidence introduced to lay the foundation for the declaration was, that the prisoner and Gibbs were seen together on the day of the homicide in the town of Ripley, and rode rapidly down the street together. Of course this did not show *prima facie* a conspiracy, and standing alone was no evidence of a conspiracy. It was error for the court to admit the testimony. But was it an error, of which the prisoner could complain ? It would not be, if afterwards there was proof to the jury, that would convince this Court, that a *prima facie* conspiracy had been formed between the parties. *Hill's Case,* 2 Gratt. 595. Although evidence of the declarations of an alleged co-conspirator be admitted without the proper foundation being laid, yet the judgment will not be reversed for this reason, if the facts proved or evidence certified shows, that *prima facie* the fact of conspiracy was established. The prisoner is not prejudiced by the mere order, in which the proof is admitted.

The evidence in the case is all certified ; and it will be easy to see, whether the prisoner was prejudiced, by the admission of the declarations of said Gibbs made in the absence of the prisoner. In considering this question we will not be at liberty to consider as part of the proof of the alleged conspiracy the declarations of Gibbs, unless they either so accompany the execution of the common criminal intent as

to become a part of the *res gestæ*, or in themselves tend to
further the execution of the common criminal intent. *Claw-
son v. The State*, 14 Ohio St. 234. One of the declarations ad-
mitted was: "Gibbs said some one had had stolen one hun-
dred bushels of wheat from his father, and he would shoot
the G—d d—n guts out of them when he found them." This
of course standing by itself could implicate no one but Gibbs
himself. The other declaration admitted was: "Gibbs
said he was after some fellows, who had stolen his wheat;
and if he caught them, and they did not give up the wheat,
they would shoot hell out of them, and he had as good a lit-
tle man with him, as there was in Roane county, and that
he would stay with him, (Gibbs)." It is shown, that the
prisoner lived in Roane county. Under the rule we have
laid down there is nothing in this declaration, that would
make it evidence of the conspiracy itself.

A careful examination of the evidence will fail to disclose
a *prima facie* conspiracy between Gibbs and the prisoner to
kill Brown. The whole evidence negatives such an idea.
Prisoner as a constable of Roane county was in pursuit of
some wheat, which he had levied on as the property of A. A.
Noyes. He was met by young Gibbs about ten miles from
Ripley with a message from Gibbs' father about the wheat.
At the request of prisoner Gibbs accompanied him to Ripley
to see about the wheat. Prisoner saw Brown, the deceased,
who had, as the evidence shows, been angry with prisoner
about a supposed interference by prisoner to prevent him
from collecting a claim against the State for going to Minne-
sota to arrest a prisoner. Brown wanted to drink with pris-
oner in Ripley, which he did, and seemed to want to be
friendly, and asked prisoner to go home with him and stay
all night, which prisoner declined to accept, on the ground
that he must go to his own home that night. There were
two roads leading towards Roane county, the "sycamore"
road and the "ridge" road. Brown wanted prisoner to go
with him out the "ridge" road, which he promised to do;
and ate supper at J. M. Green's with Gibbs. They were
advised to take the "sycamore" road as the best; but pris-
oner said, he had promised Henry Brown to go the
"ridge" road. Brown and others were going out the

"ridge" road in wagons; and prisoner and Gibbs were on horseback.

*Parsons,* a witness for the State, among other things testified, "that he was one of the parties, who hauled the wheat of A. A. Noyes to the town of Ripley * * on the 26th day of October, 1881, and left said town on the evening of said day, and was driving his team along the "ridge" road between Mt. Olive and Ripley; and that A. V. Hickman's team was a short distance ahead of witness' team, and that the team of deceased was just in front of said Hickman's team, and that prisoner and one Gibbs, after witness and said Hickman and deceased had gotten about two and one-half miles, overtook witness, and some friendly conversation passed between the parties; and that said Hickman, A. A. Noyes the prisoner, witness, and Gibbs and the deceased traveled along a short distance together; that witness invited prisoner and Gibbs to go home with him and stay all night, which they declined, stating that they must go on home; that after prisoner and Gibbs overtook witness, witness heard a pistol shot; that before deceased was shot, said Gibbs pulled out a revolver and showed it to witness; that after some conversation prisoner and Gibbs passed on, and a short time after this he heard another pistol shot; that after said first shot was fired to the time of firing of the second shot witness said Hickman and the deceased had traveled about one-half or three-quarters of a mile, and soon after the firing of the second shot witness heard deceased say he was shot; heard prisoner and deceased say something about wool, and witness heard deceased say nothing after he was shot. Witness did not hear Gibbs say anything * * ; that after said second shot was fired witness got out of his wagon and went to the wagon of the deceased, he found deceased and Noyes in the wagon of deceased, and prisoner and Gibbs were on their horses riding away in a fast walk. Witness heard Noyes halloo to prisoner and Gibbs to hold on; heard nothing in reply."

*M. V. Hickman* testified for the State among other things, "prisoner and said Gibbs passed witness, prisoner going on the left and Gibbs on the right of witness's team, and just as prisoner and Gibbs got in front of witness, witness heard two

shots fired, and said Parsons hallooed to prisoner and Gibbs, that he would rather they would not shoot any more, as the shooting frightened Parson's horses, and prisoner and Gibbs then rode on in the direction of Mt. Olive Church, and then in a short time witness looked ahead and saw the team of deceased and saw it was halted, and witness heard deceased say 'Cain, don't shoot me;' and then witness heard the report of a pistol and saw the flash and heard deceased say, 'John Cain you have shot me" and called for witness; and witness then got out of his wagon and went up to the wagon of the deceased, and found prisoner on the left of deceased's wagon and the deceased in his (deceased's) wagon, with his feet on one side of the wagon rack and his hands on top of the other side; that prisoner was about ten feet to the left of the wagon of the deceased; that when witness came up, prisoner ordered witness to halt, and Gibbs said " damn you, you will get it next." Witness ordered prisoner to leave, and prisoner asked to be allowed to leave, and prisoner passed around on the right side of the wagon of the deceased, and and got his horse. When witness first went up to the wagon of deceased, prisoner told witness to halt, and then witness compelled prisoner by words to leave; and then prisoner got on his horse and started on; that prisoner and Gibbs went off riding at a rapid gait and cheering; that said A. A. Noyes called to prisoner and Gibbs to come back, that they had shot deceased, and one of them, either prisoner or said Gibbs hallooed back, 'go to hell, Lon. Noyes.' * * * Witness, deceased, Parsons, Noyes, Casto, and the Halls had with them one-half gallon of whisky; that witness had taken but three drinks, when prisoner overtook witness out on the ridge between Mt. Olive and Ripley, and then drank once with prisoner; that deceased himself carried the whisky in a jug. * * * A. A. Noyes was with deceased, when he left the town of Ripley, in same wagon with deceased, and there were immediately present with deceased, when deceased was shot, the prisoner, himself, said William Gibbs, and said A. A. Noyes."

C. C. Eaken another witness for the State testified, that on the night of the homicide he with others was camped near Mt. Olive church, and a man rode up on a small mule

and emptied two cartridges from his revolver and said: "Boys we have shot a man back there, and he was shot bad, and hoped he would die.." He said he did not see Cain. He afterwards learned the man was Gibbs.

· Another one of the same party swore, that Gibbs said that "by G-d they had shot a man back there, that they had had him arrested, and that they had a right to shoot him." * * "After this the prisoner remarked, that he had shot him."

*Lon Rader*, another witness for the State, said he "saw prisoner and Gibbs together on their road going toward their home at Three Forks of Reedy, in Roane county, on night deceased was shot, and heard prisoner say, he had shot deceased, and heard Gibbs reply, that if prisoner had not shot deceased just when he did, he Gibbs would have shot deceased."

A. A. Noyes testified, that deceased was not arrested, but himself and others were by prisoner; that he was in the wagon with the deceased; that they were two, or two and one-half miles from Ripley, when prisoner and Gibbs overtook them; deceased and prisoner had a short conversation about some wool which deceased had bought from prisoner's wife, and then deceased and prisoner began talking about a claim deceased had against the State for making a trip to Minnesota to arrest and bring to Roane county one T. T. Fields, on a requisition, the said Fields having been indicted in the circuit court of Roane county for forgery; and during said conversation deceased asked prisoner how much he would give him for said claim, and prisoner replied he would give either three dollars, or three cents, witness did not remember which, and thereupon deceased replied to prisoner, that he had a notion to whip him, and prisoner said he must be joking, deceased said: "By hell I am not joking," and told witness to hold the lines; deceased then sprang from the wagon and started towards prisoner, and the deceased ran around ahead of prisoner's horse, and witness saw prisoner disappear from his horse at the time, and in a short time heard a pistol-shot; and witness heard deceased exclaim that he was shot, and prisoner had shot him; that witness helped deceased into the wagon, then M. V. Hickman came up to where the wagon was standing. Deceased had to go about

twenty-five or thirty feet to where the prisoner was before the shooting occurred; that before the shooting deceased and prisoner were friendly and drank together from the jug of whisky deceased had, and also from a bottle that prisoner had; that witness was not drunk, but that all the parties along, on the night of October 26 felt their drinking some; that when Hickman came up, he ordered prisoner to leave; that Gibbs took no part in the shooting; that Gibbs sat on his horse at the time of the shooting and took no part in the affray."

It seems to me from this evidence, that there is no *prima facia* case of conspiracy or anything like it made out. The idle vaporings of a man full of whisky, after the transaction cannot, it seems to me, make such a case. In admitting the declarations of Gibbs as set out in the bill of exceptions the Court erred to the prejudice of the prisoner.

The *fifth* bill of exceptions is to the refusal to give an instruction asked by the prisoner.

The said instruction asked and refused is as follows: "If the jury believe from all the evidence in this case, that the defendant was on his road home on the night of October the 26th, 1881, and had offered no provocation or violence to Henry Brown, the deceased, and while the defendant was thus pursuing his way home, the said defendant was violently assaulted by the said Brown, the said defendant could use force in his own defense without retreating, and if such force was no greater than he believed and had reason to believe, was necessary for his own protection, the defendant was justifiable, although such force resulted in the death of said Brown, and although no real danger existed in fact at the time of the killing."

The court refused to give this instruction without modification. The court properly refused to give the instruction as asked. A sufficient reason is that it does state, that the prisoner had reasonable grounds to believe and did believe that the force used was necessary to preserve his own life or protect him from *great* bodily harm. The words used in the instruction are: "And if such force was no greater than he believed and had reason to believe was *necessary for his own protection*, he was justifiable &c." This would instruct the

jury, that if he believed force was necessary to protect him from an injury however slight, even from a slap of the open hand, and it was necessary to shoot the prisoner to prevent that kind of a threatened injury, he would be justifiable. The law does not justify the taking of human life by one assaulted, unless the person assaulted has reasonable grounds to believe and does believe, that his peril is imminent, and that he is in great danger of death himself or of *great* bodily harm.

The Attorney-General insists, that the instruction is fatally defective, because it does not correctly lay down the law as to the defendants duty to retreat, and cites *Vaiden's Case*, 12 Gratt. 729, and *Gilleland* v. *State*, 44 Tex. 356. In *Vaiden's Case* at p. 729 Judge Lee says : "When a man is assaulted in the course of a sudden brawl or quarrel, he may in some cases protect himself by slaying the person, who assaults him, and excuse himself on the ground of self-defense. Before a party thus assaulted, however, can kill his adversary, he must have retreated, as far as he safely could, to avoid the assault, until his further going back was prevented by some impediment, or as far as the fierceness of the assault permitted. He must show to the jury, that the defense was necessary to protect his own life or to protect himself against grievous bodily harm." In *Gilleland* v. *The State supra*, it was held : "If defendant engaged in a combat, knowing that it would result in the death or some serious bodily injury, which might produce the death, of his adversary or himself, or by his own wrongful act brought about the necessity of taking life, he cannot plead, that such killing was in his necessary self-de-defense ; but the killing will be imputed to the malice expressed or implied by reason of the wrongful act, which brought it about."

In *Dock* v. *The Commonwealth*, 21 Gratt. 909, it was held : "Where death ensues on a sudden provocation or a sudden quarrel without malice prepense, the killing is manslaughter ; and in order to reduce the offense to killing in self-defense, the prisoner must prove two things : First, that before the mortal blow was given, he declined further combat and retreated, as far as he could with safety ; and secondly, that he killed the deceased through the necessity of preserving his own life, or to save himself, from great bodily harm."

In *Tweedy* v. *State*, 5 Ia. 433, it was held, in general terms: "A party is not compelled to flee from an adversary, who assails him with a deadly weapon, and go to the wall (as it is termed) before he can justify a homicide." The circumstances of this case are not given; so it is impossible to say, whether there was a combat between the parties or not.

In *Runyan* v. *The State*, 57 Ind. 80, it was held: "On the trial of a defendant indicted for murder, where the evidence showed, that he being disabled in one arm had procured a pistol to defend himself against a threatened assault by an able-bodied man, and that, while standing on a public street, leaning against a building, surrounded by an excited crowd, he had been threatened by another person, and then struck by a third, the deceased, whom he at once had shot and killed," it was no error to instruct the jury, that "before a man can take life in self-defense, he must have been closely pursued by his assailant and must have retreated, as far as he safely or conveniently could in good faith with the honest intent to avoid the violence of the assault." The court further held, that, where a person being without fault, and in a place, where he has a right to be, is violently assaulted, he may without retreating, repel force by force; and if in the reasonable exercise of his right of self-defense he kills his assailant, he is justifiable, and in such case the real question presented to the jury from the evidence is: "Did the defendant who was assaulted believe, and have reason to believe, that the use of a deadly weapon, was necessary to his own safety?"

On this subject the language of McIlvaine J. in *Erwin* v. *The State*, 29 Ohio St., is so applicable and well stated that we approvingly quote what he says on pp. 199, 200: "By observing the distinction between justifiable and excusable homicide *se defendendo*, as stated in the authorities above quoted, much of the discrepency in the decisions of the courts where the common law prevails, is made to disappear, most of the cases on the facts being such as would only excuse the killing. It is true under our Constitution, whether the killing in self-defense be justifiable or excusable, there must be an entire acquittal, for the reason that there is no forfeiture of goods in cases of excusable homicide. But this is no rea-

son, why the difference between the cases as to the duty of retreating to the wall should be ignored. The taking away of the forfeiture in cases of excusable homicide did not relieve the party in such case from the duty of retreating, nor did it impose such duty in cases, where it was not before required. It is true, that all the authorities agree, that the taking of life in defense of one's person cannot be either justified or excused except on the ground of necessity; and that such necessity must be imminent at the time; and they also agree, that no man can avail himselt of such necessity, if he brings it upon himself. The question then is simply this: Does the law hold a man, who is violently and feloneously assaulted, responsible for having brought such necessity upon himself, on the sole ground that he failed to fly from his assailant, when he might have safely done so? The law out of tenderness for human life and the frailties of human nature will not permit the taking of it, to repel a mere trespass or even to save life, when the assault is provoked; but a true man, who is without fault, is not obliged to fly from his assailant, who by violence or surprise maliciously seeks to take his lite or do him enormous bodily harm. Now under the charge below, notwithstanding, the defendant may have been without fault, and so assaulted, with the necessity of taking life to save his own upon him, still the jury could not have acquitted, if they found, he had failed to do all in his power otherwise to save his own life, or prevent the intended harm, as retreating as far as he could, &c. In this we think the law was not correctly stated.

"The suggestion by the Attorney-General, that that rule should be declared the law, which is but calculated to protect and preserve human life, is of great weight, and we can safely say, that rule announced is at least the surest to prevent the occurrence of occasions for taking life; and this by letting the would-be robber, murderer, ravisher, and such like know, that their lives are in a measure in the hands of their intended victims. Of course there is nothing in this opinion which will be understood, as withdrawing from the jury the determination of every question of fact involved in an issue of *se defendendo.*"

In *Shorter* v. *The People,* 2 Comst. 197, Bronson, J., said:

"When one, who is without fault himself, is attacked by another in such manner or under such circumstances, as to furnish reasonable ground for apprehending a design to take away his life, or do him some great bodily harm, and there is reasonable ground for believing the danger imminent, that such design will be accomplished, I think he may safely act upon appearances and kill the assailant, if that be necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterwards turn out, that the appearances were false, and there was in fact neither design to do him serious injury nor danger, that it would be done. He must decide at his peril upon the face of the circumstances, in which he is placed; for that is a matter, which will be subject to judicial review. But he will not act at the peril of making that guilt, if appearances prove false, which would be innocence had they proved true."

The distinction between the circumstances, under which a defendant, is compelled by law to retreat before killing his assailant to preserve his own life or to prevent the infliction of great bodily harm upon him, and those, under which without retreating he may kill his assailant in self-defense, is well and sharply drawn. It is absurd to say, that when in the dead of night on the public road or street one is violently assaulted without fault on his part, he is bound to retreat before he uses a deadly weapon in defense of his person. His very attempt to retreat under these circumstances might forfeit his life. This is a very different case from the one, where a man being himself in fault enters into a combat with another. He must cease the combat and retreat, as far as safety will permit, before he is justified under any circumstances in taking life on the ground of self-defense.

We hold the law to be, that where there is a quarrel between two persons, both being in fault, and a combat as the result of such quarrel takes place, and death ensues, in order to reduce the offense to killing in self-defense, the prisoner must prove two things: First, that before the mortal blow was given, he declined further combat and retreated, as far as he could with safety; and secondly, that he necessarily killed the deceased in order to preserve his own life or to save himself from great bodily harm. *Dock v. Comm.*, 21 Gratt. 909.

When one without fault himself is attacked by another in such a manner or under such circumstances, as to furnish reasonable ground for apprehending a design to take away his life, or do him some great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, and the person assaulted has reasonable grounds to believe and does believe, such danger is imminent, he may act upon such appearances and may without retreating kill the assailant, if he has reasonable grounds to believe and does believe, that such killing is necessary to avoid the apprehended danger; and the killing under such circumstances is excusable, although it may afterwards turn out, that the appearances were false, and there was in fact neither design to do him serious injury nor danger, that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case.

The instruction was not faulty because of the doctrine of "retreat" as there laid down. If it had been good in all other respects, it should have been given.

Bill of exceptions No. 7 was to the refusal to grant an instruction as asked, and to the modification thereof by the court. The instruction is as follows: "The jury are instructed, that as to the necessity of firing the fatal shot, and the imminency of the danger, which threatened the prisoner's life, the prisoner is himself the sole judge, and although he may have acted under a false impression, yet if he acted from an honest conviction of imminent danger of life or great bodily harm, and the attack was such, as to create a reasonable apprehension in the mind of the prisoner of such a result, then the accused is excusable in using the weapon." The court gave the instruction with this modification. Instead of saying, "and the attack was such as to create a reasonable apprehension in the mind of the prisoner of such a result," the court said, "and the attack was such as to create a reasonable apprehension in the *mind of a man of ordinary intelligence and courage* of such a result," then the accused is excused in using the weapon.

Was this modification right?

In sec. 488 1 Wharton Criminal Law, it is said: "It is conceded on all sides, that it is enough, if the danger, which

the defendant seeks to avert, is apparently imminent, irremediable, and actual. But apparently as to whom? Here three theories meet us. The first is, that the stand-point is that of the jury. No doubt in a primary sense this is correct. The jury must judge, whether the danger was apparent; but it is absurd to say, that it is necessary, that the danger must have been such as to be apparent to themselves, as they deliberate finally on the case. If this were true, an unloaded pistol would cease to be an apparent danger; for the jury, when they come to decide the case, know, that the pistol was not loaded, and know, that there was no real danger. Hence what the jury have to decide is, not whether the danger was apparent to themselves, but whether it was apparent by some other standard. What is the other standard which the jury are thus to apply?

"The answer given by several of our courts to this question is, that if a 'reasonable man' would have held that the danger was apparent then the danger will be treated as apparent. In other cases it is varied; it being said when the danger is 'reasonably apparent,' then it is to be treated as apparent. We are therefore to infer, that if a man of ordinary reason, would consider an apparent though unreal danger to be imminent and real, then this is a good defense; but that to constitute a good defense, it is necessary that the danger should have been such as to have been considered as imminent and real by a man of ordinary reason."

And in sec. 489, "But who is the 'reasonable man,' who is thus invoked as the standard, by which the 'apparent danger' is to be tested? What degree of reason is he supposed to have? If he is a man of peculiar coolness and shrewdness, then he has capacities, which we rarely discover among persons flustered by an attack, in which life is assailed; and we are applying therefore a test about as inapplicable, as would be that of the jury, who deliberate on events after they have been interpreted by their results. Or if we reject the idea of a man of peculiar reasoning and perceptive powers, the selection is one of pure caprice, the ideal reasonable man being an indefinable myth, leaving the prosecutor's case ungoverned by any fixed rule. And that this ideal reasonable man is an inadequate standard is shown by a conclu-

89

sive test: Suppose the ideal reasonable man would at the time of the conflict believe, that a gun aimed by the deceased was loaded, whereas in point of fact, the defendant knew the gun was not loaded, would the defendant be justified in shooting down an assailant, approaching with a gun the defendant knew to be unloaded, simply because the ideal reasonable man would suppose the gun to be loaded? No doubt, that in such a case no honest belief of the ideal reasonable man would be a defense to the defendant, who knew, that the belief was false, and that he was not really in danger of his life. And if the belief of the ideal reasonable man is not admissable to *acquit, a fortiori* is it inadmissable to *convict.*"

Mr. Wharton concludes sec. 491 as follows: "Viewing the law in this respect on principle we are compelled to hold that the question of apparent necessity can only be determined from defendant's standpoint." See the following cases cited by Mr. Wharton: *Grainger* v. *State*, 5 Yerg. 459; *State* v. *Rippy*, 2 Head. 217; *State* v. *Williams*, 3 Heisk. 376; *Teal* v. *State*, 22 Ga. 75; *State* v. *Sloan*, 47 Mo. 604; *State* v. *Bryant*, 55 Mo. 75; *Oliver* v. *State*, 17 Ala. 587; *Carroll* v. *State*, 23 Ala. 28; *Noles* v. *State*, 26 Ala. 31; *Wesley* v. *State*, 37 Miss. 762; *Evans* v. *State*, 44 Miss. 762; *Gladden* v. *State*, 12 Fla. 562; *State* v. *Neeley*, 20 Ia. 108; *Collins* v. *State*, 32 Ia. 36; *Morphy* v. *State*, 33 Ia. 270; *State* v. *Potter*, 13 Kan. 414; *Stoneman* v. *Com.*, 25 Gratt. 887.

This is the rule recognized by this Court in Abbott's case, 8 W. Va. 741, where it is held: "To excuse the slayer he must act under an honest belief, that it is necessary at the time to take the life of his adversary in order to save his own; and it must appear, that there was reasonable cause to excite this apprehension." The text of Mr. Wharton, which we have quoted, shows, that any other standard would lead to most absurd results. It is the slayer of his fellow man, who is being tried, and not an ideal person; the question for the jury is: Did the *prisoner* under all the circumstances surrounding him at the time of the killing believe, and did *he* have reasonable grounds to believe, that it was necessary to fire the fatal shot in order to preserve his own life or to protect him from great bodily harm? The "ordinary intelligence and courage" standard is one I have not met with in

the adjudicated cases. It is the prisoner, who is on trial; and the jury must view all the facts and circumstances of the case from the prisoners' standpoint at the time of the killing, in order to come to a conclusion as to whether his actions were under all the circumstances of the case criminal or excusable. The artificial standard set up was calculated to mislead the jury; and the court should not have so instructed them. There was no evidence in the case as to whether the prisoner was an intelligent or an ignorant man, or as to whether he was cowardly or courageous. The instruction as asked was not correct, as it seemed to leave the jury to infer, that if the prisoner *believed*, he was under the circumstances excusable in using the weapon, then the jury should conclude he was excusable.

We think the correct instruction is as follows: In such a case, as to the imminency of the danger, which threatened the prisoner and the necessity of the killing, in the first instance he is the judge, but he acts at his peril, as the jury must pass upon his actions in the premises, viewing said actions from the prisoner's stand point at the time of the killing, and if the jury believe from all the facts and circumstances in the case, that the prisoner had reasonable grounds to believe, and did believe, the danger was imminent, and that the killing was necessary to preserve his own life, or to protect him from great bodily harm, he is excusable for using a deadly weapon in his defense; otherwise he is not.

The *sixth* bill of exceptions is to the refusal of the court on the request of counsel for the prisoner, to permit the jury to take with them to their rooms the deposition of A. A. Noyes taken before the coroner at the inquest, and which as the bill of exceptions shows, was read to the jury without objection. Sec. 12 of chap. 131 of the Code, provides, that "papers read in evidence though not under seal may be carried from the bar by the jury." This section evidently refers to documentary evidence and not to depositions. If depositions had been by the Legislature intended to be included among "papers" that might be carried from the bar by the jury, a different designation would have been made. Depositions in legal parlance are not known as "papers." It would be strange to provide, that all depositions read to the jury might

be by them taken to their room, for it frequently happens, that certain parts of a deposition are inadmissible as evidence and are so ruled by the court. It would be manifestly improper, that such excluded parts should be taken by the jury with them to their room, when such parts could not be separated from the residue. The court did not err in refusing this request of counsel for the prisoner.

The *eighth* bill of exceptions is to the instructions given by the court on its own motion. The question whether in a capital or other case in this State a court has the right on its own motion, to give substantive instructions to the jury has not been discussed and will not be decided in this case. The instructions are as follows:

"The jury is instructed that the *killing* is homicide and is either justifiable and excusable or felonious; and if they believe from the evidence that the prisoner killed the deceased, and that the killing was in self defense, or was otherwise excusable they will find the prisoner not guilty; but if they believe from the evidence, that the killing was felonious, then they will determine, whether the prisoner is guilty of murder or manslaughter, and if guilty of murder, whether guilty in the first or second degree. Murder in the first degree is defined by statute to be murder by poison, lying in wait, imprisonment, starving or any willful, deliberate and premeditated killing, or in the commission of or attempt to commit arson, rape, robbery or burglary. Observe it must be willful, deliberate and premeditated, and with malice prepense. If they find the prisoner guilty of murder in the first degree, the penalty is death, unless they find that he shall be punished by confinement in the penitentiary. All murder is presumed to be murder in the second degree, and is punishable by confinement in the penitentiary not less than five nor more than eighteen years. The State to elevate the offense charged, to murder in the first degree, must do so by proof showing it to be of that character above stated. The prisoner may by proof show, or from all the circumstances show that the homicide (killing) was justifiable or excusable, and the offense may thus be reduced to manslaughter, and is either voluntary or involuntary manslaughter. Voluntary manslaughter is the intentional killing but upon sudden prov-

ocation and in the heat of passion and is punishable by confinement in the penitentiary for not less than one, nor more than five years. Involuntary manslaughter is the unintentional killing, and is a misdemeanor."

While there is much of this instruction, that propounds the law correctly, yet there are two fatal objections to it. It first instructs the jury that, "All homicide is either *justifiable and excusable, or felonious."* This is not correct, as homicide may be involuntary manslaughter and under the statute a *misdemeanor*, and therefore would be neither *justifiable, excusable* nor *felonious.* But there is yet another flagrant error in the instruction. It correctly states, "All murder is presumed to be murder in the second degree," and states how it is punishable, then correctly states, that to elevate it to murder in the first degree, the State must show, that the crime of murder in the first degree has been committed. Then it correctly states, that "The prisoner may by proof show, that the homicide (killing) was justifiable or excusable," but then incorrectly states in this connection, " *and* the offense may *thus be reduced to manslaughter*, and is either voluntary or involuntary manslaughter. If the killing was *justifiable* or *excusable*, it could not be *manslaughter* either voluntary or involuntary, because as we have seen where it is shown, that the killing was justifiable and *excusable*, the prisoner is entitled to an *acquittal.* But although the proof or circumstances do not show the killing to be justifiable or excusable, yet there may be palliating circumstances shown, which may reduce the offense to manslaughter.

The *ninth* bill of exceptions is to the giving of four several instructions asked by the State.

The first is, "The court instructs the jury that where a homicide is proved the presumption is that it is murder in the second degree. If the State would elevate it to murder in the first degree, she must establish the characteristics of that crime, and if the prisoner would reduce it to manslaughter, the burden is on him." This instruction is correct. *Hill's Case*, 2 Gratt. 595.

The *second* instruction is: "A man shall be taken to intend that, which he does, or which is the immediate or necessary consequence of his act; and if the jury believe from

the evidence in this case, that John W. Cain, the prisoner, with a deadly weapon in his (prisoner's) possession, without any or upon very slight provocation, gave to the deceased, Henry Brown, a mortal wound, then said Cain is *prima facie* guilty of willful, deliberate, and premeditated killing, and throws upon the prisoner the necessity of proving extenuating circumstances, and that unless the prisoner has proved such extenuating circumstances, or such circumstances arise out of the case, made by the State, the jury must find the prisoner guilty of murder in the first degree." This instruction lays down the law as announced in *Hill's Case*, 2 Gratt. and is the law in this State now.

The third instruction is: "The bare fear that a man intends to commit murder or other atrocious felony, however well grounded, unaccompanied by any overt act indicative of any such intention, will not warrant killing the party by way of prevention. There must be some overt act indicative of imminent danger at the time, but the jury will judge, whether the conduct and acts of the deceased, Henry Brown, at the time of the shooting were of such a character, as to create in the mind of the prisoner a reasonable fear, that the deceased intended to commit murder or other felony, or to do the prisoner great bodily harm. Apprehension of danger, to justify a homicide, ought to be based not alone on surmises; but there ought to be coupled therewith some act on the part of the party, from whom danger was apprehended, evidencing an immediate intention to carry into execution his threats or designs; and the jury are to judge of the reasonable grounds for such apprehension on the part of the prisoner from all the facts and circumstances, as they existed at the time of the killing." This instruction propounds the law correctly. *Stoneman's Case*, 25 Gratt. 887. It also recognizes in the clearest language, what we have already decided, that it is the *prisoner's* stand-point which the jury must regard, and not that of the ideal "reasonable man."

The *fourth* instruction is: "If the jury believe from the evidence that, Henry Brown, the deceased, did make an assault with his hands, or fists upon the prisoner, on the night in question, and the prisoner had reason to believe that the deceased was not armed with a deadly weapon; and if

they further believe from the evidence, that the prisoner had opportunity of avoiding the necessity of using his revolver on the deceased, either by continuing on his horse, or otherwise, without danger to his life or great bodily harm, considering all the circumstances of the case, then the use of said revolver by the prisoner was not excusable on the prinple of self defense."

This instruction ought not to have been given, because it does not propound the law correctly and was calculated to mislead the jury. It says, that "If the jury believe from the evidence, that Henry Brown, the deceased, did make an assault with his hands or fists upon the prisoner on the night in question, and the prisoner had reason to believe he was not armed with a deadly weapon," &c.; if it had stated that if he had reason to believe and did believe, that the deceased was not armed with a deadly weapon, and had reasonable grounds to believe and did believe, that from the attack he was not in danger of losing his life, or of receiving great bodily harm, then it would have been proper to instruct the jury, that he was not under these circumstances excused in using the weapon; but on the other hand, as we have seen, if in the violence of the attack and all the circumstances of the case he had reasonable grounds to believe and did believe, that he was in danger of losing his own life, or of suffering great bodily harm, and was in no fault himself, that he was not bound to retreat, and will be excused under such circumstances for using the weapon, although it might turn out, that he "had an opportunity of avoiding the necessity of using his revolver on the deceased either by continuing on his horse or otherwise." It is for the jury to judge under all the circumstances of the case, whether under the law, as before stated, the prisoner was or was not excusable in using the weapon.

The *tenth* bill of exceptions is to the refusal of the court to set aside the verdict and grant a new trial. As this case must go back for a new trial, it is improper for the court to say whether the verdict ought to have been set aside as contrary to the evidence. *Abbott's Case*, 8 W. Va. 741. As to the after discovered evidence, we have carefully read the affidavits and do not think, that they show sufficient ground

for setting aside the verdict and granting a new trial.  It is an immaterial matter however to decide, as on the next trial the alleged newly discovered evidence, if proper, will be admitted.

As to the improper conduct of the jury; a careful reading of the affidavits on this subject will disclose the fact, that there was no separation of the jury, indeed it is not claimed, that there was; and it is denied that any one spoke to the jury touching the case.  Indeed every affidavit as to improper conduct on the part of the jury is denied; and we cannot say, that such improper conduct clearly appears to us.  It is charged in some of the affidavits, that there were winks exchanged between the prisoners, attorney and one of the jury, and levity indulged in on the side of the prosecution. While this is denied or explained, we must say it is not very satisfactorily done.  If anything of the kind was done, it ought to have been observed by the judge, who tried the case, and the severest reprimand ought then and there to have been administered.  If the court did not observe it, counsel for the defendant should have observed it and at once called the attention of the court thereto.  It is a very serious thing to try a man for his life or liberty; and while such a trial is in progress, the greatest decorum ought to be preserved; levity at such a time and under such circumstances is entirely out of place.

For the foregoing reasons the judgment of the court below must be reversed; and this Court proceeding to render such judgment as the circuit court should have rendered, the verdict of the jury is set aside, and this cause is remanded for a new trial.

THE OTHER JUDGES CONCURRED.

JUDGMENT REVERSED.    CAUSE REMANDED.