Staples, J.,
delivered the opinion of the court.
The prisoner was indicted in the Circuit court of Carroll county for the murder of Annuel Edwards. At the April term 1874 he was tried and convicted of murder in the second degree, and the period of his confinement in the penitentiary fixed at nine years.
During the progress of the trial the prisoner offered in evidence the record of a suit for a divorce between the deceased and Ollie Edwards, the former wife of the deceased, and also the sister of the prisoner. To-the introduction of this evidence the commonwealth objected; and the court sustained the objection as to all the record, except the decree; which was admitted.
The prisoner excepted, and this is his first bill of exceptions. It is very clear that the decree itself was competent evidence to show that a divorce had been granted. Eor this purpose the prisoner was entitled to rely upon it with a view to the introduction of the said Ollie Stoneman as a witness for him. Whether it was essential to that object, it is not material now to enquire.
The decree might also have been important to show that the deceased being no longer the husband of Ollie Stoneman, was a mere intruder upon the pre *892 mises of the prisoner’s family; having no pretense of a right to go there, and might be justly regarded and ' treated as a trespasser and an enemy. Indeed the divorce was necessary to explain the real status of the parties, and the circumstances which led to the homicide. The decree was therefore very properly admitted by the court to go to the jury. But it is very difficult to see upon what ground the preliminary proceedings which led to the decree could be regarded as evidence for any purpose. The commonwealth was not a party to that suit nor privy to it, and neither the recitals in the bill and answer, nor the depositions, were competent to establish the existence of any fact against her. It is very clear, therefore, that the court did not err in its rulings upon this point.
In the further progress of the trial, after the prisoner had proved by his sister Ollie Stoneman, that the deceased had made various threats against members of the family, and had on several occasions manifested a purpose to burn the dwelling, the attorney for the commonwealth asked the witness if she had not received messages from the deceased which contained no threats, to which the witness replied that she had. In answer to another question the witness said she had received a message from him through one Mr. Lundy. The attorney for the commonwealth then asked her to state what the message was. To which question and the witness answering the same, the prisoner objected; but the court overruled the objection, and directed the witness to answer. The bill of exceptions, however, does not state whether in fact the witness did answer the question. It maybe that she was' unable to remember or repeat the message. And if she remembered and repeated it, we have no means of knowing what it was. The message may have related *893 to some matter having no connection with the homicide. It may have been so entirely immaterial as to produce no impression on the mind of the jury. The hill of exceptions ought to have contained the answer of the witness, that this court may see whether it was material, and possibly may have affected the finding of the jury. The omission renders it impossible for us to consider the question raised by this bill of exceptions.
The evidence being concluded, the commonwealth’s attorney and the prisoner by his counsel each asked for instructions, which will now be considered. The commonwealth’s instruction asserts the proposition, that the bare fear that a man intends to commit a murder or other atrocious felony, however well grounded, unaccompanied by any overt act, indicative of any such intention, will not warrant killing the party by way of prevention. There must be some overt act indicative of imminent danger at the time.
The prisoner objected to this instruction, and instead thereof, he moved the court to give the jury five other instructions. The two first may be thrown out of view as they have no material bearing upon the point of controversy here. The third and fourth declare that if the j ury believe from the evidence that the accused did the shooting under the immediate apprehension that his own life or that of some member of the family was in imminent danger, or under a reasonable apprehension that the deceased intended to bum the dwelling-house of his mother, or commit some other known felony, and that there was imminent danger of such design being carried into execution, then they must acquit the accused, although such danger was unreal.
These instructions, as also the first and second al *894 ready alluded to, together with the commonwealth’s instructions were given by the court, but the fifth asked for by the prisoner was refused. The learned counsel for the prisoner, in their petition and in their argument here, insisted that there is such conflict between the commonwealth’s and the prisoner’s instructions as was calculated to confuse and mislead the jury, and therefore both could not be consistently given. Upon a careful examination it will be found that the instructions, so far from being in conflict, are in entire harmony with each other.
The prisoner’s instructions, as has been seen, declare that the killing was justifiable if done under a reasonable apprehension of a felony, although it should afterwards appear that no felony was in fact intended. But the question still recurred, what is that reasonable ■apprehension upon which the party may act and safely kill his adversary ? Is the bare fear of great bodily harm sufficient? If the slayer, alarmed by antecedent threats and menaces of danger, kills his adversary, when there is no real or apparent peril at the time, may he be justly said to have acted under such reasonable apprehension as justifies or excuses the homicide. Suppose, as was argued in this case, the prisoner honestly believed that the deceased was the mortal enemy of his family, that he intended to murder some member of it, or to burn the dwelling, and that this belief was impressed upon his mind both by the teaching of others and the previous conduct and threats of the deceased, would such a belief or apprehension justify the killing, although at the time there was no appearance of imminent danger, and no act or demonstration on the part of the deceased, indicating a pre•sent purpose to carry his designs into execution.
It is apparent that these questions could not be *895 solved by the jury without the aid of the court. They involve difficult propositions of criminal law, in regard to which the courts have not been always unanimous; and it is not reasonable to suppose that twelve únprofessional minds, however intelligent, unaided by judicial explanation, could satisfactorily determine them.
This explanation is given, or sought to be given, by the commonwealth’s instruction, and the jury are there told, that a bare fear that a man intends to commit a felony, however well grounded, will not warrant the killing the party by way of prevention. There must be some overt act indicative of imminent danger at the time. These considerations are sufficient to show there is not the slightest conflict in the instructions as given by the court, but that they simply assert mutually dependent parts of the same general proposition.
The learned counsel for the prisoner have very strenuously insisted that the commonwealth’s instruction is not sufficiently explicit; that the term “overt act,” particularly, is an obscure one, and could not have been fully comprehended by the jury. It has been held in several cases, that an instruction may be so equivocal that to give or refuse it may mislead the jury, and thus it may have all the effect of an erroneous instruction. In such case it is the duty of the court to modify it so as to make it plain. But it would be difficult to maintain the proposition that a verdict, based upon an instruction, is to be set aside because its true import and meaning may not have been comprehended by the jury, when the instruction correctly expounds the law, and is expressed in terms familiar to the books and well understood by the judicial mind. According to this view, the appellate tribunal, in reviewing the decisions of the trying court, must have regard not merely to the legal propositions brought in *896 fiuestiori5 but also to the supposed capacity of the jury to comprehend them. It is impossible to foresee the mischief that will result from such a doctrine, as the same test must be applied to civil as to criminal cases.
In the case before us the jury did not express any desire for an explanation of the meaning- of the instruction. Had they required it, they would no doubt have asked for it. Throughout the proceedings in the coui’t below it was at no time suggested that the jury did not fully understand the instruction; and I think we are bound to conclude they were not embai’rassed by any difficulty of the kind.
The instruction presupposes a case of apparent as distinguished from real danger. It affirms that to render the killing justifiable, there must be some overt act; that is, some open manifestation of a purpose to make the attack. This is upon the idea that if the act or demonstration is concealed, it is impossible to say there is an apparent danger, which is the assumed ground of justification. As was said in Evans’ Case, 44 Miss. R. 762, when we use the term appai’ent danger, we mean such overt actual demonstration, by conduct and acts indicative of a design to take life or to do great personal injury, as would make the killing apparently necessary to self-preservation.
The term “overt act” is used by the most approved writers on criminal law as descriptive of the facts and circumstances constituting excusable homicide in self' defence upon apparent necessity. Thus, in Bishop on Criminal Law, 2 vol., § 627, it is said, although it is lawful for one to deprive of life another meditating his life, yet he must wait till some overt act is done in-pursuance of the meditation. In other words, till the danger becomes imminent. The same expression occurs in Wharton Criminal Law, 2 vol., § 1027, and *897 in Bast’s Crim. Law, 272. Indeed, the entire instruction is taken almost literally from the latter work. Bast, however, lays it down that to render the killing justifiable there must be actual danger at the time, a limitation not found in the instruction.
This identical phrase is repeatedly used in the same connection by the courts of our sister states. I will cite only a few of the cases which are most accessible. They may be seen in Horigan and Thompson’s Cases of Self Defence.
In Hinton’s case, 24 Texas R. 454, it is declared, the belief that another intends to inflict on the party serious bodily harm must be founded in part, upon some overt act of the deceased showing that he has present intention to inflict the injury.
The Supreme court of Mississippi in Dyson’s case, 26 Miss. R. 862, lays down the rule as follows: In order to justify the killing there must be some overt act indicating a present intention to kill the party or to do him some great bodily injury.
The danger of such design being accomplished must be imminent; that is to say, immediate, pressing and unavoidable at the time of the killing.
Mere fears of a design to commit a felony, or to do some great personal injury to the party, though honestly entertained, unaccompanied by any overt act indicating a design immediately to commit a felony or to do the injury, will not justify the killing. See also Nesby’s case, 37 Miss. R. 327; Evans’ case, 44 Miss. R. 762.
And so it has been held in Rorth Carolina, in State v. Scott, 4 Ired. R. 409, that the belief that a person designs to kill me will not prevent my killing him from being murder unless he is making some attempt to execute his design, or at least is in an apparent sit- *898 nation to do so, and thereby induces me reasonably to think that he intends to do it immediately.
In Tennessee the Supreme court say: It is not enough that the defendant honestly entertains the opinion that his life is in danger, but he must believe the danger imminent. There must be some overt act indicative of a present purpose to take life. Williams’ case, 3 Heiskill’s R. 373.
Previous threats, or even acts of hostility, how violent soever, will not of themselves excuse the slayer, but there must be some words or overt act at the time clearly indicating a present purpose to do the injury. Riply case, 2 Head’s R. 217.
In McLeod’s case, 1 Hill, N. Y. R. 391, 419, Cowen, J., speaking for the Supreme court of Hew York, said: “Hothing is better defined, nor more familiar in any system of jurisprudence, than the juncture of circumstances which can alone tolerate the action of the law of necessity. A force which the defendant has the right to resist, must itself be within striking distance. It must be-menacing, and apparently able to inflict physical injury, unless prevented by the resistance which he opposes.”
These citations I think abundantly show not only that the phraseology of the commonwealth’s instruction is entirely unexceptionable, but that it correctly states the principles of law governing the case. I have taken the trouble to examine with some care the numerous decisions bearing upon this perplexing question. The only cases I, have been able to find, which apparently disapprove of the limitations contained in the instruction, are Granger’s case, 5 Yerger’s R. 459; Phillips’ case, 2 Duvall’s R. 328; Carieo’s case, 8 Bush’s R. 124; and Bohannon’s case, 8 Bush’s R. 411; the first named decided in Tennessee, and the *899 three latter in Kentucky. In Granger’s case it was held that if a man, though in no danger of serious bodily harm, through fear, alarm or cowardice, kill another under the impression that great bodily injury is about to be inflicted upon him, it is neither murder nor manslaughter, but self-defence.
The Kentucky cases just cited, hold that where a person has once escaped from assassination, and his ■enemy still persists in his murderous designs, he is not obliged to retreat from or avoid his enemy, but may kill him wherever, in his lawful way, he may find him. These cases perhaps stand alone in opposition to the whole current of English and American authorities. They go far beyond Selfridge’s Case, which at the time was regarded as pushing to its extreme limits the doctrine of justifiable homicide upon apparent necessity. And yet it has been well said by an eminent authority, the illustration given by Chief Justice Parker in that case shows that he limited the application of the principle to cases where not only there is reasonable .ground to believe that there is a design to destoy life, but where that reasonable, belief is based not on surmises or inferences, however intelligent, but on an actual, immediate and physical attack from the assailant.
As has been already seen, the doctrine of Granger’s Case has been long since repudiated or explained away in the state which gave it birth, and the decisions of the Tennessee courts are in entire accord with the current of English and American authorities. I do not ■deem it necessary to make any further citation from these authorites. All will acknowledge the great difficulty of laying down any general rule upon this subject equally applicable to all cases. But the general principle to be deduced from the decisions is, that *900 while antecedent threats and acts of hostility may be-J J looked to.in connection with the present conduct of assailant, as furnishing reasonable grounds of apprehension, such threats and acts are not, of themselves, sufficient to justify the party in slaying his adversary. The bare fear, however honestly and seriously entertained, will not constitute a justification. The right of resorting to force, upon the principle of self-defence, does not arise while the apprehended mischief exists in machination merely. There must be some act menacing present peril, or something in the attending circumstances indicative of a present purpose to make the apprehended attack. The' act so done, or circumstances thus existing, must be of such a character as to afford a reasonable ground for believing there is a design to commit a felony, or to do some serious bodily harm, and imminent danger of carrying such design into immediate execution. Under these circumstances the killing will be justifiable, although it should afterwards turn - out that appearances were deceptive, and there was in fact no design to commit a felony or to do great personal injury.
1
These principles of law apply with equal force to the defense of one’s habitation. As a man may repel force by force in defense of his person or property against one who manifestly endeavors, by violence or-surprise to commit a known felony upon either, and in these cases is not obliged to retreat but may pursue-his adversary until he has freed himself from all danger; so with the habitation as with the person, the law does not require there should be actual danger to justify the killing. But it does require there should be reasonable ground for apprehending a design to commit a felony upon such habitation; and further, there should be reasonable ground also for believing *901 the danger imminent that such design will be accomplished. The acts or circumstances constituting a proper foundation for a reasonable apprehension have been already discussed and explained. This branch of the case does not require further consideration. Besides the cases already cited, there are many others of equal weight and authority, fully sustaining the views here expressed. They may be found in Horrigan & Thompson’s new work on cases of self defence. See also Nilberger’s case, 8 Nash. C. C. R. 515.
Another point made by the counsel for the prisoner is the failure of the Circuit judge to explain to the jury what constituted an “overt act.” I think, as will be hereafter seen, he did so tell them. It is sufficient now to say that he was not requested to make any such explanation. If he had been and had refused or declined to do so, the question would be before us in a very different aspect. It might, with equal propriety, be claimed, that it is incumbent upon the court to explain what is meant by “malice prepense” when informing the jury that its existence is essential in •order to a conviction of murder in the first degree. That the prisoner’s counsel fully comprehended the meaning of the phrase in its then connection, and desired no explanation of it, is apparent from the fact that they have also used the same expression in instruction Ho. 5, asked for by him and refused by the court.
The prisoner’s third bill of exceptions, which was taken subsequent to the verdict, after setting out the commonwealth’s instruction, and the five instructions asked for by the prisoner, and the objections thereto, states that the court sustained the objection made to instruction Ho. 5, and refused to give it, and overruled the objection of the accused to the instruction asked *902 for by the attorney for the commonwealth, and gave the same to the jury with the following addition, to-wit: But the jury will judge whether the conduct and acts of the deceased, at the time of the shooting, were-of such a character as to create in the mind of. the prisoner a reasonable fear that the deceased intended to commit murder or other felony, or do the prisoner great bodily harm.
The learned counsel for the prisoner insist that this addition is erroneous in restricting the jury to a consideration of the conduct and acts of the deceased at the time of the shooting, and in excluding his acts and declarations of a previous date, as justly affording, in connection with his conduct at the time, reasonable grounds for apprehending the committal of a felony by the deceased.
It must be borne in mind that the real point of controversy between the' commonwealth and the accused was whether the prisoner, under an apprehension created by antecedent acts and declarations, might lawfully kill without some overt act on the part of the deceased, evincing a present purpose of carrying his threats into execution. The court held that such an act was essential to afford a ground of reasonable apprehension; and then, in explanation of what was meant by the expression “ overt act,” the judge said, “the jury will judge whether the conduct and acts of the deceased, at the time of the shooting, were of such a character as to create in the mind of the prisoner a reasonable fear that the deceased intended to commit murder or other felony, or to do the prisoner great bodily harm.” That the prisoner’s counsel did not construe the observation of the judge as excluding from the jury the antecedent threats and acts of the deceased, is very apparent from the fact, that they, the *903 counsel, made no objection to it at the time. The evidence of these threats and acts had been received without restriction or opposition. They were before the jury in the fullest manner, and they were no doubt considered and discussed in every possible aspect and bearing.
It is to be observed also that the motion for a new trial was not based upon the ground of a misdirection in this particular, but upon the ground that the refusal to give instruction Ho. 5, and the giving the commonwealth’s instruction with the addition thereto, was calculated to mislead the jury. How. mislead the jury? By excluding from their consideration proper evidence? By no means. But, in the language of the petition, because the instructions were calculated to induce the jury to come to the conclusion that the deceased had no intention to burn, as he had no torch in his hand, and no intention to take life, as he did not point his gun.”
Throughout, the burden of the complaint has been, not that the jury were prohibited from considering previous threats and acts, but that they were told that these threats and acts were of themselves not sufficient to justify a reasonable apprehension, upon which the prisoner might act and safely kill his adversary.
This view becomes well nigh absolutely conclusive when we take into consideration the verbal explanation made by the judge to the jury, of the instructions as given. He stated to the jury, they would reconcile the instructions by understanding that apprehensions of danger, to justify a homicide, ought to be based, not upon surmises alone, but there ought to be coupled therewith some act on the part of the party from whom danger was apprehended, evidencing an intention to carry into execution his threats or designs.
*904 This language presupposes that the previous acts and declarations of the deceased were before the jury, and were to be considered by them in connection with what occurred at the time of the homicide, with a view-to determine whether the prisoner acted under a reasonable apprehension of danger. '
The learned counsel for the prisoner, as I understand, concede this; but they insist that as the instructions were in writing, the explanation ought also to have been in writing, that the jury might have both in their retirement.
There are several very satisfactory answers to this view. In the first place, if the jury carried the instructions with them into their retirement, or read them at all, after they were given—and upon these points we have no information—it is impossible to say they did not as fully and as clearly understand the explanation as the instructions. It is couched in plain and simple language, easily understood by the most ordinary mind, and we must presume was perfectly intelligible to the jury.
In the second place, the prisoner did not ask that the explanation should be reduced to writing. His counsel did not object to it because it was not in writing. They agreed it should be given as it was given, and they consented for the jury to retire without expressing the slightest dissatifaction. These considerations would seem to be conclusive against the interference of this court for alleged error, arising under the third bill of exceptions.
There is a well established rule of law which applies as well to the verbal explanation in question as to the addition made by the judge to the instructions of which so much complaint has been made. If no objection be made to an instruction at the time it is *905 .given, and no exception taken nor the point saved, but objection be made for the first time after verdict, and in the form of a motion to set it aside, the court will consider whether, under all the circumstances, the party has been prejudiced by the instruction; and if of opinion that a just verdict has been rendered according to the law and the evidence, will not set it aside on account of that objection. Bull’s case, 14 Gratt. 613; Read’s case, 22 Gratt. 924.
Ho exception having been taken nor objection made at the time to the addition made by the judge to the instructions, or to the verbal explanation given by him, and such objection having been made in the form of a motion for a new trial only, it may be proper to consider whether the verdict is just and sustained by the evidence. TJpon this point there would seem but little room for discussion.
The excuse given by the prisoner for the homicide is that the deceased had threatened tb kill members of the family and burn the house; and the prisoner feared he was there for one of these purposes. At the time of the shooting the deceased was in the woods about one hundred yards from the dwelling occupied by the family of the prisoner. The deceased was easily seen. So far from making an eftort particularly to conceal himself, he was making a noise, it seems, to at" tract the attention of his former wife, to whom it is very clear he was anxious to be reconciled. The hour of the day and all the surrounding circumstances ought to have satisfied the prisoner there was no imminent danger of the commission of a felony by the deceased. The prisoner having discovered the position of the deceased, walked to the rear of the smokehouse and deliberately shot him down. Being asked what he had shot at, he replied he had shot at the *906 deceased. He was told he ought not to have done so; he said he thought he was there to do some private injury to some of the family. This was all, and the subject was dismissed, as if the firing'had been at some wild beast rather than a human being. It is true the prisoner expressed the opinion he had not hit the deceased; but still no effort was made to see whether the victim might not, perchance, be then bleeding and dying in the forest.
At that time there was residing upon the premises, within the enclosure, two families consisting then of three men and three adult females, a force more than sufficient to arrest the deceased, and place him in the custody of the officers of the law. In 186,9, about the time of granting the divorce, the deceased had been arrested upon a peace warrant, at the instance of the mother of the prisoner, and required to give sureties for his good behaviour for a year. This was never renewed, and no effort ever thereafter made to renew it. Instead of resorting to a peaceful remedy of this sort, the prisoner adopts the dreadful alternative of taking life. The excuse for this is based purely upon antecedent acts and declarations of the deceased. It is true that the deceased had made threats against the prisoner and his .family, if the evidence is to be believed; but it is clear he was not a violent or dangerous man. Nearly five years had elapsed since the divorce, which was the beginning of the hostility, and during all this time it does not appear that any member of the family had been assaulted or injured by him. At the time of the shooting, the deceased was sitting quietly in the bushes,.unarmed, unresisting:not only making no attack or demonstration of a hostile character, but so situated as to be incapable of making it had he desired.
*907 It is a circumstance, worthy of observation, that all the threats and attempts to burn the dwelling are proved in every instance by the immediate family of the prisoner, and, what is very remarkable, they were never communicated to a human being outside of that family until after the homicide. It is very certain that the jury placed but little confidence in the testimony upon this point. If they believed it, they were satisfied there was nothing in the conduct of the deceased on that occasion calculated to produce the slightest apprehension that he was there with any felonious design, or that the danger was imminent or threatening, and could not have been met and provided against without peril or difficulty.
Every impartial mind must admit that either view is fully justified by the evidence. A careful examination of the facts certified, leads irresistibly to the conclusion that the killing was not upon any necessity, real or apparent, but upon a principle of deliberate revenge. The youth of the prisoner, it is very probable, only saved him from a severer fate.
Eor these reasons the judgment of the Circuit court must be affirmed.
Judgment aeeirmed.