MILES WILSON, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Threats of violence by the deceased against the accused, though not communicated to the latter, are admissible as evidence where there is any doubt as to who began the encounter. They tend to show that it was the intention of the deceased at the time of the meeting to attack the accused, and hence tend

to prove that the former brought on the conflict, and are relevant evidence. If all the evidence is to the effect that the defendant was the aggressor, they are not admissible.

2. The question of the admissibility of uncommunicated threats as evidence touching the issue who began the encounter is one for the court, its function being merely to decide whether or not, viewing the entire evidence at the time the offer to prove them is made, there is any doubt as to who began the encounter. Their weight when introduced, is for the jury's determination, upon considering them in connection with all the other evidence.

3. The wife of the deceased was the only witness present at the time of the homicide. She testified that defendant came to deceased's home, a small log house with two rooms, in the morning about day light, before sun-rise, and called the deceased and shot through the back door; deceased got up out of bed immediately, and put on his pants and opened the front door and asked defendant where he was; the latter replied that he was "around here," and then he walked around to the front door and said: "Hollis, I want my money; I have got to have it," and also asked him what that was he had in his hand, and as soon as he said this the pistol fired, and deceased exclaimed that he was shot, and ran into his room to his wife, and then ran out after defendant. That deceased did not have any pistol that she knew of, and again that he had no weapon when he went out, nor any the night before; that she did not get out of bed until defendant had shot deceased; and that it was just a moment from the time Miles fired into the back door until deceased opened the front door. She also testified to a white handled pistol being on the front piazza, which she said was not her husband's. It was not indisputable, viewing the entire evidence, whether the accused shot with a white handle or a black handle pistol, or that the accused ever had a white handled pistol. There was evidence that they had gam-

bled the evening before at deceased's. house, and had quarreled, the deceased refusing to play longer, and the defendant had threatened to kill the deceased if he did not give defendant his money back or play with him until he broke him. *Held*, (Mabry J., dissenting), that the case was one in which the testimony did not show the exact attitude of the parties at the time they came in sight of each other, and that the trial judge erred in holding that no predicate had been laid for the admission of any threats by the deceased against the accused.

4. A person's dwelling houre is a castle of defense for himself and his family; and an assault upon it with intent to injure him or any of them, may be met in the same way as an assault upon himself or any of them, and he may meet the assailant at the threshold and use the force necessary for his or their protection against the threatened invasion and harm.

5. Where the force of an instruction which is requested and is proper in itself, is not changed by an addition made to it by the court, there is no error in the mere fact of making the addition.

6. There must have been not only the belief, but also reasonable ground for the accused to believe that, at the time of killing the deceased, he was in imminent or immediate danger of his life or great bodily harm from the deceased, to excuse the homicide on the ground of self-defense.

7. The words, "first done some apparently hostile act towards the defendant," suggested as a safe substitute, on a new trial, for the words, "first assaulted him with a deadly weapon," in a charge that if the jury "believed from the evidence beyond a reasonable doubt that the defendant went to the house of the deceased and commenced and brought on the difficulty, and shot him down and killed him without the deceased having first assailed him with a deadly weapon, putting the defendant

in reasonable fear of his own life or of any great bodily harm to himself;" they should find him guilty as charged in the indictment.

Writ of Error to the Circuit Court for Alachua county.

## STATEMENT.

The testimony, in so far as it need be given, is, in substance as follows :

Rachel Wilson, the wife of the deceased, was the only witness to the homicide. She says that the defendant and the deceased had been playing cards on Monday, the day before the homicide, at the deceased's house, or, as his wife says, her house, (which, the testimony shows, was a small log-house with two rooms) and the deceased had won and had declined playing any more, and at this the defendant had become displeased and they had quarrelled, or had, as stated in another place, a little dispute, and the defendant had demanded of the deceased that he should continue to play or give him back his money, which the deceased had, in effect, declined to do, but had offered him two dollars, which the prisoner refused to take, saying that he must have every cent of it, or they must play. They parted near about sun-down, the defendant going off, but Hollis did not tell him to come back and get the money. The next morning about day-light, and before sun-rise, the defendant returned to the deceased's house, the deceased and his wife being then still in bed, and called Hollis and shot through the back door. Hollis got up immedi-

ately and put on his pants, opened the front door and said : "Miles, where are you?" Miles replied : "I am around here," and then walked around to the front door, and said : "Hollis, I want my money ; I have got to have it ;" and also asked Hollis what was that he had in his hand, and then, as soon as he asked this, the pistol fired, and Hollis said : "Lord, have mercy, I am shot," and said that Miles had shot him, and ran into the room to his wife. Then Hollis ran out after Miles, who ran ahead, and Hollis, as he was coming back to the yard, fell on his face, when one Alex. Wilson came up. She also says that Miles shot Hollis ; that Hollis was inside the house, and, after he was shot, ran out after Miles, and that Hollis did not have any pistol that she knew of ; and again, that he had no weapon when he went out, nor any the night before ; that he was in the house, and was shot before he went out ; that George Carlisle was present on Monday and carried Miles off that day ; that she did not get up until miles shot Hollis ; that she stood in the piazza and said : "What is the matter with you?; how much money did he win from you?; I will get it and give to you," and that when Alexander Wilson came up he asked her for the money to give to Miles ; that it was just a moment from the time Miles fired into the back door until Hollis opened the front door.

She also says that the "pistol I saw on the piazza was a light, white handle pistol; didn't take it up ; it was not my husband's pistol." The physician, W. M. Bailey, who attended Hollis, going to his home

about seven o'clock on the morning of the altercation, testified as to the wound of Hollis and his dying from its effects. He also says that when Frank Brown came with the prisoner to where witness was living, Brown said he was hunting a pistol, and wanted to know if witness had seen the pistol, and witness told him he had not. Witness further said that no remark was made about the shooting, and (referring to the pistol in court) that Miles acknowledged that that was the pistol he shot the man with; that this admission was "voluntary and free." He also states, on cross-examination, that when Brown came there with prissoner inquiring for the pistol, he had a pistol in his hand, "and allusions were made to the pistol I had seen there at Holli's'.' Frank said : 'This is the pistol Miles Wilson shot with.' Frank Brown asked about another pistol, and said this is the one he shot with, and he assented by a nod of the head, saying 'yes.' It was a white stock pistol, ordinary size; do not know what calibre. I believe it was a white stock; it was not a very large stock. He said nothing else except to nod the head, as I remember. Was there in the custody of Frank Brown. The pistol at Hollis' house was like the one Brown had that morning, that lay on the portico as I went in. I don't know what became of it ;" observed it when he got there. Frank Brown, a witness for the defendant, as we understand, testified that he arrested the defendant, but that he never went to Bailey's house, nor had any conversation with Bailey, and did not remember having seen Bailey at any time the defendant was in his custody ; that he

took the pistol in court from defendant, a Smith & Wesson, a "black pistol." "This is the pistol I took from Miles." That he brought another pistol into court, a little pistol he got from Hollis' father when witness was in the street at Archer, and the other he took from Miles when he was arrested. He arrested Miles, who ran when witness got in a hundred and fifty yards of him.

George Carlisle also testified that the deceased and defendant were gambling on the stated Monday, and that as he came back by there that evening they were disputing, and Miles said to Hollis: "Hollis you brought me up here to gamble, and promised to either break me of my money, or to play my money back. You must either give me my money back or play with me until you break me, or I will shoot you." That Hollis didn't say anything about playing any more, only that he had won the money from him, and was not going to give it back. That Hollis had a black handle pistol in his pocket that evening, and that they "were not very angry." That the game of cards they were playing was "skin," a game, we may remark, which has figured with marked frequency in the records of homicide among the colored people, rivalling even the popular "festival" in its notorious connection with these deadly altercations.

William Bell testified that he remembered the time Hollis was killed; that he had just got up and was putting on his clothes when Miles came home where he, witness, was, "about a quarter of a mile away," about day-light.

Miles Wilson v. The State of Florida.—Opinion of Court.

Miles Wilson's statement is as follows: I and Hollis Wilson were gambling last Monday in November at his house. We were gambling and Hollis got to disputing over some bets. We got tired, and I told Hollis I believed I would quit and go to town. I got up, went off to town, and when I got there Hollis was there. He came up to me and said: Miles, you must come to my house tomorrow morning, we wont gamble any more to-day; come to my house soon in the morning. I told him all right. Tuesday morning I went to his house. When I got to his house I called him and said: "You going to gamble any more to-day?" He came to the door, threw it open, and put a pistol in my face and said: "No; I am going to kill you." I whirled my back to him, pulled out my pistol and fired. He jumped off then and ran after me. I never went back there. Don't know whether I hit him or not. I did it to save my life.

The other facts in the case are stated in the opinion of the court.

*The Attorney-General* for Defendant in Error.

RANEY, C. J:

The plaintiff in error was found guilty of murder in the first degree, and has been sentenced to be hung. There are but two questions presented to us on the writ of error:

1. The defendant before making a statement of his defense to the jury offered to prove by one Lee Wood,

a witness who had been sworn, that the deceased, Hollis Wilson, had on the day before the homicide made threats of violence against the defendant, and the State objected on the ground that no foundation had been laid, and the court sustained the objection, and the prisoner excepted. After this the prisoner made a statement of his defense under oath to the jury, and then renewed the offer, with like result, and excepted. The evident effect of the ruling is that the testimony did not present a predicate upon which any threat of violence towards the accused could be introduced. The argument urged against the ruling of the trial judge is that there was doubt or a question as to who began the conflict, or was the assailant, and that the threats were consequently admissible.

The doctrine, that threats of violence by the deceased against the accused are admissible, where the question whether the deceased or the accused commenced the encounter is in any doubt, even though the threats were not brought to the knowledge of the accused, was recognized in Bond vs. State, 21 Fla., 739, and Garner vs. State, 28 Fla., 113, 9 South. Rep., 835, and is affirmed by the authorities cited in those opinions. *Vide* also Wharton's Cr. Ev., sec. 757; Johnson vs. State, 54 Miss., 431; Hawthorne vs. State, 61 Miss., 749; Johnson vs. State, 66 Miss., 189. The principle of the admission of threats, under such circumstances, is that they tend to show that it was the intention of the deceased at the time of the meeting, to attack the accused, or that he was seeking the latter's life, and hence they tend to prove that the

former brought on the conflict, and consequently are relevant evidence. The philosophy of the matter is that where there has been an encounter, and it is not shown by direct evidence who was the assailant, threats of an intention to assail are some evidence of an assault having been made by the one who made the threats. The question of the admissibility of threats in such cases is one for the court, but the function of the court is merely to decide whether or not, viewing the entire evidence at the time the offer to prove them is made, there is doubt as to who was the assailant or brought on the encounter. If all the evidence is to the effect that the defendant was the aggressor, then they are not admissible.

In Wiggins vs. People, 93 U. S., 460, the deceased was sitting on the steps of the building, with his face resting on his hands, as the accused and Dobson, the only witness to the encounter, approached. Dobson also said that the defendant jumped to his rear and immediately the firing began; that he did not know and could not tell who fired the first shot; that at the first report witness turned around and saw the blaze of a second shot from a pistol in the hands of defendant, and said: "Jack, don't kill him," and then the defendant jumped on the steps and fired another shot, the deceased then raising his hands and crying: "Don't kill me; I am unarmed." That immediately after the firing ceased, defendant stooped down as if to pick up something, and, when he raised up, had something in his left hand, but witness could not tell whether it was a pistol or not, and at the same time

defendant remarked to deceased: "You wanted to kill me," or "You tried to kill me," witness not being sure which expression was used. The accused had put the deceased and one Dean, who were quarrelling, out of the former's bar-room previously on the same night. There was testimony that the deceased had a pistol before this encounter, and a witness, who was within hearing, testified to hearing four shots. Three pistols were found on the accused when he was arrested immediately after the killing, of which one was fully loaded, one had three barrels empty, and the other, one barrel empty; the last pistol being identified as that of the deceased, and the second as that of Dean, the accused having taken it out of the hands of Dean just before the encounter, he finding Dean in the recess of a door way on the side walk. The lower court had refused to permit the accused to prove that the deceased had shortly before the shooting made the threat that he would kill defendant before he went to bed that night, which threats it was admitted could not be brought home to defendant, but the Supreme Court of the United States reversed the ruling, remarking that both the effect and credibility of Dobson's testimony were to be weighed by the jury; and that the trial court had no right to assume that it was beyond doubt that the defendant had commenced the assault which resulted in death, by firing the first shot without any cause real or apparent; and that it must be very apparent that if the person to whom the deceased exhibited his pistol a few minutes before the shooting had been permitted to tell the jury that the

deceased made the threat indicated, it would have tended strongly to show where that first shot came from, and how the pistol with one chamber emptied came to be found on the ground, and that in all events in the condition of things it was relevant to the issue, and should have been admitted.

In People vs. Scroggins, 37 Cal., 676, the deceased tore down the fence to defendant's field in the latter's presence, and defendant drew him out of the vehicle he and his family were in, and a scuffle ensued, and a third person coming up, took from deceased and gave to his wife a pistol, which deceased had placed in his breast pocket the day before, he never having been in the habit of carrying a pistol. Deceased then drove off, but shortly he stopped, and rising in an angry manner, threatened to tear down the fence and shoot defendant, and then rode on further and stopped and began to tear down the fence again. The defendant then mounted a horse, and, passing the deceased, went to a neighboring house where he borrowed a shot gun, with which he returned to the place where deceased had broken down the fence last. The latter had gone, and was then driving through the field, and the defendant pursued him, having the shot gun lying across-wise in front of him, and on overtaking deceased and coming within range shot him, and he fell from the vehicle, and the pistol was found on the ground, near to the deceased, by those who immediately came to his assistance. One of the physicians testified that "his right arm must have been raised, from the position of shot, at the time of receiving it." The widow

of the deceased stated, however, in her testimony, that at the time of the fatal shot the pistol was lying in her lap with her hand resting upon it, and that it had not been out of her possession from the time when she received it, as mentioned above. The theory of the defense was that the deceased, as the defendant approached, raised the pistol in a threatening attitude and was about to fire on the defendant when the former received the fatal shot, and consequently that the homicide was committed in self defense; and the defendant offered to prove threats made by the deceased against the life of the accused on the day of, and a few days before, the homicide, but not communicated to defendant. Overruling the refusal of the *nisi prius* judge to permit this proof to be made, and in answer to the argument of the State's counsel that there was an entire absence of proof that the deceased was the assailant, the appellate court observed that it was enough on this point to say that the wife of the deceased was the only witness immediately present at the time of the encounter, and though she testified that she had the pistol in her lap at the moment when her husband was shot, and had not parted with it from the time she received it, it was for the jury to decide upon her credibility; and there was evidence tending to show that the pistol was found immediately after the affray in the position above shown, and one of the physicians had testified that from the position of the wound, the right arm of the deceased must have been elevated when he received the fatal shot; which facts, it was said, were not referred to in intimation of

any opinion as to the weight to be attached to them, nor as exprsssing any doubt of the widow's testimony, but as being matters for the jury, and as showing that proof of various threats was not wholly irrelevant and impertinent.

Myers vs. State, 62 Ala., 599, was a case in which on the day of the homicide the deceased and accused and others met at the house of one Patterson, who testified that he and deceased were conversing outside of the house when defendant came out and asked deceased about some locks. He gives their conversation, the defendant making the first offensive remark, and also states that defendant complained to deceased about the way the latter had treated him as to the boat the day before, and the deceased replied that if he had been "over there" when defendant threatened to kill him yesterday, one of them would have gone to the lower world "right there"; and that thereupon defendant replied that deceased should have a trial of it then, and got up from where he was sitting. Patterson then told them they must stop, and not have any fuss there; and he further testified that he heard several licks behind him, and on looking around he saw defendant cut deceased just over the right ear with a pocket knife, and saw deceased stagger and fall. It was also shown that shortly after the difficulty the deceased's hickory stick was found near where he had fallen. It was admitted that one Edney Walton, if present, would testify that on the morning of the homicide deceased came by her house with a hickory stick, about an inch in diameter, in his

hand, and asked if defendant was there, and on being told that he was not, replied that he was hunting him; that this was his business up here to-day, and that he had to kill defendant, or defendant kill him; and that then deceased inquired if defendant was up at Patterson's house, and, on receiving the reply that she, Edney Walton, thought he was, went off in the direction of such house which was distant about half a mile. The last testimony was excluded, and for this erroneous ruling the judgment was reversed. The court said that if the accused advanced on the deceased in a threatening manner, the deceased could strike in anticipation, provided he did not employ unreasonable force in repelling the impending assault, and such blow would be self-defense, although the first stricken. That if the positive testimony or circumstances show with the requisite certainty that defendant was advancing on deceased or menacing him with present danger, having in either event a drawn knife or other deadly weapon, or being in the act of drawing such deadly weapon, then a blow of the deceased, although the first struck, to save himself from such impending peril, would not constitute him the aggressor, but would stand justified under the law of self-defense; and that if these be the facts, then such first blow by the deceased, if not greatly disproportioned to the peril, would neither excuse nor mitigate the fatal wound inflicted by the prisoner; that a man may not bring on or provoke a difficulty and then justify the use of deadly weapons under the plea of self-defense; that the previous state of feeling between the

parties and any prior threats by the slain should exert no influence on the jury unless there was on the part of the slain a present impending purpose, real or apparent, to put such threats into immediate execution. And it held that there was an absence of proof of the exact attitude of the parties at the onset of the rencontre; that whether the accused was advancing with a weapon drawn or in the act of being drawn, what was the attitude of the deceased at the time, were questions upon which there is no positive proof; and further, that the purpose of the deceased in visiting the place where the homicide was, might shed some light on the question, but his purpose and any uncommunicated threats should weigh nothing with the jury if the deceased did not first make some demonstration of an intention to carry them into present effect; and that under the circumstances of this case, and with the cautionary limitations expressed above, the testimony of Edney Walton should have been admitted, to show the feeling of the deceased towards the defendant, and the purpose of the former in going to Patterson's house.

The Supreme Court of Mississippi, in Johnson vs. State, 54 Miss., 430, recognized the doctrine stated above as to the admissibility of uncommunicated threats, but held them inadmissible upon the facts of the case. The main witness hearing the report of a gun, went to the front of his house and saw the smoke of a gun in front of deceased's house, ten or fifteen yards from deceased's wood yard, passing over the cotton stalks in a patch of rank cotton near the wood

pile; and going to the place he found deceased shot through the head with buck shot, and having an axe-helve tightly grasped in his hand. He examined for tracks, but saw none. He also said that two or three days before this the deceased had gone to defendant's field and shot him, wounding him in the hand and body, and that just after the shooting, and while defendant was fleeing, deceased said to the latter that he would kill him if he ever laid eyes on him again. The defendant then offered to prove that every day for three days before the homicide, the deceased had declared his intention to kill accused whenever and wherever he should see him, but the trial court refused to permit it; and this ruling was affirmed on the ground that there was no testimony tending to show a conflict or combat, or that the deceased was doing anything, or making any demonstration which was threatening, hostile or dangerous to the accused, or that he was in a situation to do so; but showed rather that the accused had concealed himself in the rank cotton with a shot gun, and had fired when in no danger, either real or apparent. "Whenever," says the opinion of Chalmers, J., "the testimony leaves it doubtful whether the attack was made by the deceased or the prisoner, the threats of the former, whether communicated or not, should be admitted in evidence, not as constituting of themselves any defense to the homicide, but as tending to show whether or not it was an act of self-defense; and uncommunicated threats may be admitted in evidence, therefore, even

Miles Wilson v. The State of Florida.—Opinion of Court.

where there are witnesses to the killing if their testimony leaves it doubtful who began the deadly encounter, and, under the same principle, they will ordinarily be admitted where there were no witnesses to the killing, as in *Stoke's Case*, 53 N. Y., 164;" but they will not be admissible, even in such a contingency if the circumstances show an unmistakable case of lying in wait and assassination; and as they will be excluded where living witnesses negative any assault by the deceased, so they will be when undisputed facts demonstrate the same thing. And the same court held in Hawthorne vs. State, 61 Miss., 749, and Johnson vs. State, 66 Miss., 189, that such threats are admissible where there is conflict of evidence as to who was the aggressor.

The above cases, considering their respective circumstances, illustrate in different aspects the doctrine under discussion; and the conclusion we have reached as to the cause before us is that the Circuit Judge erred in holding that no predicate had been laid for the introduction of evidence of threats, though uncommunicated. The exact attitude of the accused and deceased at the time of the firing is not shown, even if it can be said to be known by any one. The wife of the deceased was in bed. Of course she could not see the defendant, and knew nothing of his bearing at the time he came in sight of the deceased as the latter stood at the front door. That she was looking at the deceased at that moment, or when the pistol shot was

heard, even if she was so located as to enable her to see him, is entirely a matter of inference. It is true she says that the deceased had no pistol "that she knew of," and that he had no weapon when he went out on the night before, and that the white handle pistol was not his, but when we consider that she was in bed, and that she does not say she saw or was looking at him when the accused asked him what it was he had in his hand, and that a pistol was found on the piazza, which at least intervened the deceased and the defendant if the latter had not come upon it, and was at all events a part of the scene of the encounter, it can not be denied that the inquiry of the defendant and the presence of the pistol were parts of the *res gestæ*, and relative to the attitude of the defendant, and to be passed upon as such by the jury, and also to be considered by them in connection with the statement of the accused as to the deceased being the aggressor. Whether or not the accused shot with a "white handled" or a "black" pistol is not indisputable, but in view of the testimony of Bailey and that of Brown, was a question for the jury. If Brown is to be believed, there is no evidence that the accused ever had a white handle pistol. Under these circumstances it can not be held either that it was altogether clear and undisputable that the accused was the aggressor, or that there was no testimony which had *any tendency* to show that the accused was the assailant. On the contrary, we think that the case is one in which the

testimony does not show the exact attitude of the parties at the time of the homicide; and that all the facts and circumstances, including anything showing the hostile feelings and purposes of the parties, should have been permitted to go to the jury. The ruling of the trial judge excluded everything in the nature of a threat or hostile declaration by the deceased against the defendant.

In reaching the conclusion announced in the preceding paragraph we are not unmindful that one's home is the castle of defense for himself and his family, and that an assault upon it with an intent to injure him or any of them, may be met in the same way as an assault upon himself or any of them, and that he may meet the assailant at the threshold and use the necessary force for his and their protection against the threatened invasion and harm; State vs. Patterson, 45 Vt., 308; Pond vs. People, 8 Mich., 150; People vs. Coughlin, 67 Mich., 466; Morgan vs. Durfee, 69 Mo., 469; State vs. Peacock, 40 Ohio St., 333; Stoneman vs. Commonwealth, 25 Gratt., 887; but the purpose and necessity for the conclusion we have reached is the ascertainment of the attitude of the parties at the time they came together, and to this end it is the duty of the court to admit all relevant testimony, in order that the jury may discharge their exclusive functions as to its credibility and weight. Moreover this is not a case in which the statement of the accused is the sole

basis for the introduction of further testimony to prove threats which he has already proved, as in Bond vs. State, *supra*.

II. The only other point to be considered relates to a charge to the jury. The defendant requested the judge to charge the jury: If the jury believes from the evidence that at the time the defendant shot Hollis Wilson, he had reason to believe that said Hollis Wilson intended to kill him, or to do him great bodily harm, and that if the prisoner believed that such shooting was necessary to save his own life, or to protect him from some great bodily harm, then the defendant was justifiable in shooting, and the jury should find him not guilty. The judge gave the instruction, not, however, merely as it was offered, but adding thereto the following: But if you believe from the evidence, beyond a reasonable doubt, that the defendant went to the house of the deceased and commenced and brought on the difficulty with the deceased in his own house, and shot him down and killed him, without the deceased having first assaulted him with a deadly weapon, putting the defendant in reasonable fear of his own life, or of any great bodily harm to himself, then you must find him guilty as charged in the indictment.

It is urged that there was error in not giving the charge as it was when offered, without any addition, and also that the addition is not good law.

If the instruction asked had no error in it, and the addition made to it were likewise free from mistake, we do not think it could be said there was error in the mere fact of making the addition. The force of the instruction asked is not changed by the addition. Young vs. State, 24 Fla., 147, 3 South. Rep., 981. But in our judgment the instruction is defective in not embodying the further idea of there being reasonable ground for the accused to believe that he was then in imminent or immediate danger of his life, or of great bodily harm from the deceased. Smith vs. State, 25 Fla., 517, 6 South. Rep., 482; Pinder vs. State, 27 Fla., 370, 8 South. Rep., 837. Of course this deficiency could not have operated to the disadvantage of the defendant, nor be complained of by him. Without going into any full discussion of the addition to the instruction, or saying that the objection made to it would be error under the circumstances of this case as shown by the record before us, we will merely suggest as a safe substitute for the words "first assaulted him with a deadly weapon," the words "first done some apparently hostile act towards the defendant." Of course it is not every overt act of the deceased that will justify the taking of human life; it must be such an act as reasonably puts the slayer in fear of imminent danger of losing his life or suffering great bodily harm, and a jury will not acquit where the act of the deceased is not of this character; and as held in Lovett vs. State, decided at this term, one can

not set up in his own defense a necessity which he has brought upon himself.

The judgment is reversed, and the cause is remanded for a new trial.

Justice Mabry dissents from the conclusion announced in the first sub-division of the above opinion.