104 So.2d 739 (1958)
Clarence Jackson HARRIS, Appellant,
v.
STATE of Florida, Appellee.
No. 133.
District Court of Appeal of Florida. Second District.
August 15, 1958.
Rehearing Denied September 2, 1958.
*740 D.C. Laird, Lakeland, and John W. Stanford, Fort Lauderdale, for appellant.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., Tallahassee, for appellee.
BIRD, JOHN U., Associate Judge.
This is an appeal from a judgment and sentence of manslaughter in the Criminal Court of Record of Polk County, wherein appellant Clarence Jackson Harris was sentenced to the State Prison.
The facts, as disclosed by the record, are that appellant and his wife and daughter, Willie Dean Harris, were at their home in the country in Polk County when the deceased, Cecil Brewer, Jr., came to see the daughter and an argument soon developed between them. As the argument progressed, the deceased used very abusive and profane language to her. The mother called appellant, who was working in the back yard or grove, and when he reached the front of the house where the parties were he told them to stop the fussing and requested deceased to leave the premises. He then returned to his work in the back. Deceased, however, failed to leave and pressed his argument with the daughter and angrily pushed her down on the driveway. Appellant was again called to the front, and he then called his daughter into the house and again ordered deceased to leave. The deceased, nevertheless, followed the daughter into the house over her protest and that of her mother and father, and continued to curse and abuse her and her family. When deceased said that appellant's daughter was a whore, appellant again told him to leave, and deceased arose from a sitting position and made some kind of motion, which is not clear from the record but which seems to have alarmed appellant, and he went into his bedroom and secured a pistol and returned to the livingroom with it in his hand. The deceased started out. When he got to the steps on the unscreened porch he suddenly and angrily turned and started back into the house, opened the screen door and said,
"I came here for trouble and I'll give you plenty of it."
At this time the fatal and only shot was fired. The bullet entered and passed through the upper right arm and entered the body at the level of the seventh rib,
"* * * approximately going straight, perhaps slightly toward the back. There wasn't much difference in the plane of the bullet." (Dr. L. Stephan)
deflected and came to rest near the eleventh rib.
The record indicates that the deceased was a relatively young man, 31 or 32 years of age, six feet tall and weighing 180 to 200 pounds and was very active and strong. The appellant was of a slight build, 70 years of age and had an injured shoulder. The deceased and the daughter had contemplated marriage and had gone so far as to have blood tests made to secure a marriage license, but disagreement occurred and she called the marriage off. This apparently was the cause of the trouble between them.
It appears that the deceased was not armed at the time, but appellant did not know this. The daughter testified that the deceased usually carried a pistol and had drawn it on her and had told her that if she did not marry him nobody else would.
*741 The porch where deceased was lying when the ambulance arrived was six feet eleven inches in width, the floor being five and one-half inches lower than the floor of the house. There was a screen door between the porch and the livingroom and it was apparently through this opening that the deceased was shot. At the time of the shooting appellant was standing in the livingroom, about six feet from the door, and the deceased was on the porch at or near the door  re-entering the house. They must have been some six or eight feet apart. The bullet did not pass through the screen, so the door must have been open or partly open. After the shooting, deceased was made as comfortable as possible and an ambulance and officers called. When the ambulance arrived deceased was either dead or died soon thereafter
The daughter, who was the Court's witness, testified in part as follows:
"I tried to get him to leave and he wouldn't. He said some smart remark and pushed me and pushed me down. Mother saw that and that's when she called my father back.
"And daddy came to the front porch and said, `Hun, will you please come in the house?' I said, `Yes sir.'
"And he said, `Cecil, you get on away from her.' I went in the house and Cecil got out and followed me in the house. He wasn't invited in.
"Daddy, when I walked in, my father was sitting down on the settee there. I walked in. Mother was already sitting down. He walked in right behind us and daddy said, `Cecil, I told you to get away from here. I've asked you now.' And I even begged him, but he insisted, fact, forced his way in, invited his own self in. He wasn't invited. And he sat down and said, `I want to say something to Dean.'
"I said, `I don't have anything to say to you.' And he called me  he said in front of daddy and mother, he said, that I wasn't nothing but a damn whore. When he said that daddy jumped up and said, `Cecil, get out of my house.' And he said, `The whole damned bunch of Harrises,' something like that, `is nothing but damn so and so's.'
"Daddy begged him to get out. So daddy jumped up and he jumped up. Daddy was scared of him and I was too. In fact, he had me scared all the time. He threatened me lots of times.
"So daddy got up and went out of the living room. I guess he went into the bed room. I said, `Cecil, please leave from here.' And he got up and left, and he got to the doorsteps, and fact, I went to the door there. He got on the steps and turned around and said, `I came out here for trouble and I'll give you plenty God-damned of it.' On the order of that. I can't remember exactly the words he did say.
"When he started back in the house, when he grabbed for the door, he really was mad coming back in. I stepped back and that's when the gun went off. I didn't know daddy was behind me, but daddy said he was frightened of him, but he wouldn't have done anything if he hadn't started back in, because he was coming back to harm some of us. * * *
"But he was still breathing when they put him on the stretcher and carried him off the front porch. That's the way it was, and I was scared of him. That's one reason, he had me scared of him, because he told me lots of times if I didn't marry him, nobody else would.
"In fact, he carried a gun on me once before and I swore out a warrant for him at Winter Haven for coming to my apartment drawing a gun on me. I was frightened of him, scared of him. My daddy done what he thought trying to protect us. I don't know if he would *742 have harmed me, father or mother. We was there and father is small. Cecil was six foot something and weighed 180 pounds. He was a strong person and I know he carried a gun most of the time."
The appellant testified in part as follows:
"A, Well, just as soon as he sot down, he asked Willie wasn't she going with him, to marry him, and she says, `Heck, no.' And then he popped out and said that bad word about her, and I hopped up and got between him and the dining room. You all seen the tables. And asked him three times to get up and get out of my house, and he just kept talking nasty talk and all all the time.
"I asked him three times and he kindly done that-a-way and then he straightened up and I backed into the dining room and went into my living room and got my gun from under my pillow.
"Q. Now, when you say you backed back in the dining room, what room did you go into to get the pistol? A. My bed room.
"Q. You went into the bed room? A. Yeah.
"Q. After you got in, where did you go then? A. I come back out of it, come in the living room, and he was just going out the screen door and stepped off the living room floor down on the porch floor. He was that much of going out of the house, done stepped on the porch out of the living room. And I said to myself  I had the gun right down by the side of my leg, my arm on my leg, and I said to myself, `Thank God for that.'
"And when he got to the door steps there was a post right here at the corner of the door steps, and here's the door steps east of the post, and he just wheeled around and he says, `I come here for trouble and I'll give you plenty of it.'
"Q. What did he do then? A. Come back and reached and got the screen door and best of my knowledge, the door was just about that much open. And you know, a man turning back and you telling him to get out and him coming on you, a big man like that, I was scared of him.
"Q. When he had the screen about that far open, is that when you shot? A. That's when the gun went off.
"Q. When you shot him? A. Yeah.
"Q. You say you were scared of him? A. Yes sir, and him coming back in my house.
"Q. All right, was he a bigger man than you are? A. Sir?
"Q. Was he bigger than you are? A. Yes sir, looked like to me he'd weigh 200 pounds, six foot high, a young man. And here I am disabled, you might say, behind my shoulder.
"Q. How many times did you shoot? A. One time.
"Q. Why did you shoot him? A. I was scared of him.
"Q. You was scared of him? A. Yeah, he was so much more powered man than I was. If I'd been a man sort of like him, when he come in there after I told him not to, I'd have knocked him out with my fist."
These two witnesses were the only eye-witnesses who testified, and their testimony, as set out above, was never substantially changed, modified or discredited although they were both subjected to very rigid, thorough and masterly cross-examination; and it was never impeached, discredited *743 nor controverted and was rather strengthened by the physical facts, so it must be taken as true. We cite Brannen v. State, 94 Fla. 656, 114 So. 429.
At the conclusion of all of the testimony the defendant made a motion for a directed verdict of not guilty, which was denied by the Court.
The appellant does not deny the slaying, but contends that it was justified. Since there is no evidence that the deceased was armed, appellant must rely upon the physical conditions and the circumstances attending the parties and the oral testimony to show the reasonableness of his belief of imminent danger of commission of a felony or great personal injury to himself or family at the hands of deceased. Section 782.02, F.S.A., provides:
"Homicide is justifiable when committed by any person in either of the following cases: (1) When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person shall be; or (2) when committed in the lawful defense of such person of his or her husband, wife, parent, grandparent, mother-in-law, son-in-law, daughter-in-law, father-in-law, child, grandchild, sister, brother, uncle, aunt, niece, nephew, guardian, ward, master, mistress or servant, when there shall be a reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished; or (3) when necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace."
This statute has been before the Supreme Court many times and its meaning is clear. In Linsley v. State, 88 Fla. 135, 101 So. 273, 274, the Court said:
"The law of justifiable homicide by self-defense has many times been set forth in decisions of this court. There must be reasonable grounds to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished. `Imminent means near at hand, mediate rather than immediate, close rather than touching.' The one interposing the defense must not have wrongfully occasioned the necessity; he must have used all reasonable means in his power, consistent with his own safety, to avoid the danger and to avert the necessity of taking human life; the circumstances must be such as to induce a reasonably cautious and prudent man to believe that the danger was actual and the necessity real, in order that the slayer may be justified in acting upon his own belief to that effect."
The law of self-defense requires everyone to avoid killing when possible and to retreat, if necessary, and consistent with his own safety before taking life, but when a person is in his own home and he or the members of his family are assaulted or placed in apparent imminent danger of great personal injury, he has the right to stand his ground and meet force with force, even to the extent of taking life if he actually believes, and the circumstances and surrounding conditions are such that a reasonably cautious and prudent person would believe, danger of death or great personal injury to be imminent, at the hands of assailant. Wilson v. State, 30 Fla. 234, 11 So. 556, 17 L.R.A. 654; Peele v. State, 155 Fla. 235, 20 So.2d 120; Russell v. State, 61 Fla. 50, 54 So. 360; Lightbourn v. State, 129 Fla. 43, 175 So. 857.
The State, in its very able brief, contends that the homicide was unnecessary *744 and was induced by the unreasonable fear or cowardice of appellant.
Of course, it is the law that men do not hold their lives at the mercy of unreasonable fears or excessive caution of others, and if from such motives human life is taken there is no justification. It is also true that mere words, however abusive, profane or insulting, or opprobrious epithets, do not furnish justification, but it is true that when the person killed is an aggressor and trespasser and by his acts, coupled with such language and threats, induces a reasonable, honest and actual belief of imminent danger of the commission of a felony or great personal injury to another and homicide results, there may be justification.
A person may act upon appearances as they appear to him at the time, even to the extent of taking human life if he honestly and actually believes  and the attending circumstances and conditions are such that a reasonably cautious and prudent person would believe  that he or some member of his family is in imminent danger of death or great bodily harm at the hands of the deceased. The danger need not be real or actual, but the appearance of danger must be both real and imminent and the slayer must honestly believe it is necessary to act in order to save his own life or that of a member of his family from death or great personal injury in order to constitute justification. He must actually and reasonably believe the danger to be actual and the necessity real. Smith v. State, 25 Fla. 517, 6 So. 482; Howell v. State, 66 Fla. 210, 63 So. 421; Lightbourn v. State, 129 Fla. 43, 175 So. 857.
The Jury are the sole judges of the credibility of the witnesses and the weight of the evidence, but not solely of its sufficiency. Bailey v. State, 76 Fla. 213, 79 So. 730. If the verdict is supported by the evidence it will not be disturbed on appeal. The legal effect of competent evidence which is not impeached, discredited or controverted is a question of law. Holton v. State, 87 Fla. 65, 99 So. 244; Brannen v. State, 94 Fla. 656, 114 So. 429.
The undisputed facts of this case establish that appellant, seventy years of age, of slight build and with a crippled shoulder, and his family were peacefully in their modest home in the country on the evening of the slaying when deceased, a man of thirty-one or thirty-two years of age, six feet tall and weighing 180 to 200 pounds, a rejected suitor, came to this house seeking trouble, as he said, and belligerently started an argument with appellant's daughter, pushed her down in the driveway and, over her protest and that of appellant, followed her into the house cursing and abusing her, and when repeatedly ordered to leave starts out, gets to the steps, suddenly and angrily turns, opens the screen door and starts back into the house and says, "I came here for trouble and I'll give you plenty of it." He was probably unarmed at the time but this fact was unknown to appellant, and he could, by reason of his overwhelming prowess, inflict great personal injury with his bare hands.
Deceased was a trespasser, after warning in the home, and an aggressor throughout the difficulty, and we find that any normal and reasonably cautious and prudent person under the attendant circumstances and conditions that surrounded appellant at the time would actually believe, as did the appellant, that he or his family were in imminent danger of death or great personal injury at the hands of deceased. Law and reason did not require or expect appellant to abdicate his home and leave his wife and daughter to the mercy of this enraged man, and we conclude, and hold, that the slaying was justified.
The judgment and sentence is reversed and annulled and the defendant discharged.
KANNER, C.J., and SHANNON, J., concur.